**B. H. TUREEN HOTELS, Inc., a Corporation, Plaintiff-Appellant,**

**v.**

**NACHMAN & COMPANY, Inc., a Corporation, and United States Air Conditioning Corporation, a Corporation, Defendants-Appellants.**

No. 46399.

Supreme Court of Missouri,

Division No. 1.

Nov. 10, 1958.

**423**

Shifrin, Treiman, Agatstein & Schermer and Gerhard J. Petzall, St. Louis, for B. H. Tureen Hotels, Inc.

Lashly, Lashly & Miller, John H. Lashly, Paul B. Rava, St. Louis, for Nachman & Co., Inc.

Kramer & Chused, Max W. Kramer, St. Louis, Louis Sachs, Minneapolis, Minn, for United States Air Conditioning Corp. Joseph Nessenfeld, St. Louis, of counsel.

HYDE, Presiding Judge.

Action for damages in two counts for breach of contract of sale of an air conditioning unit; Count I for breach of an implied warranty and Count II on the theory of total failure of consideration. The jury found for plaintiff against both defendants on Count I for $12,450.26 and found against plaintiff and for both defendants on Count II. The jury also found for defendant, Nachman & Company, Inc. (hereinafter called Nachman), and against defendant, United States Air Conditioning Corporation (hereinafter called Airco), on its cross claim for $12,450.26; and also found for Nachman against plaintiff for $2,222.17 on its counterclaim. All parties have appealed. Nachman and Airco contend that no case of breach of warranty was made against them and that they were each entitled to a directed verdict.

Plaintiff's claim grows out of two contracts, a contract of sale with Nachman and a warranty furnished by Airco. The material part of the sale contract was as follows: 'It is agreed that Nachman & Co. Inc. is to furnish freight prepaid to St. Louis for the sum of Nine Thousand Two Hundred and Seven Dollars ($9207.-

00) the following air-conditioning equipment: (1) US AIRco RK 50 Refrigerator Kooler-aire Unit. The complete assembly to include 8 cylinder 'V' type Schnacke compressor together with 50 H. P. three phase, 60 cycle, 208 volt motor and across-the-line magnetic starter with thermal overload protection; 6 row direct expansion evaporative cooling coil (face area: 24 sq. ft.) with multi outlet thermal expansion valves; 2 row standard steam heating coil; centrifugal blowers and 10 H. P. blower motor; 50 ton evaporator condenser; filter provisions with throwaway type filters and complete refrigeration circuit. The compressor unit starts unloaded and features capacity modulation.

"All equipment herein proposed is factory fresh, new and carries the manufacturer's warranty against defect in manufacture for a period of twelve months from date of operation as set forth in their specifications.

"It is understood and agreed that the cost of installation is not incorporated in the selling price of this contract."

Airco furnished the following warranty:

"United States Air Conditioning Corporation warrants that all usAIRco products are free from defects of material and workmanship.

"As a part of this Warranty, United States Air Conditioning Corporation agrees to replace or repair free of charge F.O.B. factory, any part or parts manufactured by it which shall, within twelve months after date of initial installation, be returned, upon authorization, to the factory with transportation charges prepaid and upon examination shall prove to have been defective. This Warranty shall be effective for a maximum period of eighteen months from the date of shipment of the goods hereby warranted.

"No liability whatsoever shall attach to United States Air Conditioning Corporation until said products have been paid for and then such liability shall not exceed the cost of parts required to correct defects.

"United States Air Conditioning Corporation makes no warranty whatsoever with respect to motors, switches, controls, etc., inasmuch as they are usually warranted separately by their respective manufacturers.

"This Warranty shall not apply to any part or parts which have been subject to misuse, negligence or accident. Neither shall it apply to any part or parts which have been altered or repaired outside of our factory without our authorization.

"The Warranty and liability set forth above are in lieu of all other Warranties and liabilities expressed or implied."

Plaintiff had begun remodeling of the Majestic Hotel in St. Louis in March, 1952, including alterations on the lobby and basement floors, and air conditioning of these two floors was included in its plans. Plaintiff's president, B. H. Tureen, met with the Nachmans, father and son, and T. J. Waddell, representing Airco in that territory, and the purchase of a 50-ton package unit was made by plaintiff, relying on their recommendation. This was the first unit of that size sold by Airco and the only one Airco ever sold in Waddell's territory, although there was testimony that 300 had been sold in the whole country thereafter. It was intended that Nachman would install the unit. However, the general contractor, Jones Brothers Construction Company (hereinafter called Jones), had a subcontractor for installing the duct work for heating and air conditioning, Consolidated Heating and Engineering Company (hereinafter called Consolidated), and upon their insistence the installation was done under their contracts; but the work was actually done by A. C. Engineering Company (hereinafter called A. C. Co.), the subcontractor's subcontractor. The unit was delivered in St. Louis completely assembled charged with Freon gas, and ready to go into operation, but was too large (15 feet long, 5 feet wide, 8½ feet high) to be taken from the lobby to the basement through the existing openings (it was to be lowered through a stairway opening

from which the stairs had been removed); so the A. C. Co. took out the gas and cut the unit into three or more parts with an acetylene torch. These parts and the pipes they contained were later welded together in the hotel basement before the unit was installed. While these parts were in the basement disassembled (from four to six weeks), there was much dust and dirt from the remodeling work, especially from taking off plaster and plastering; and it was shown that dust, dirt, other foreign matter, even moisture, getting into the pipes of the unit would cause damage to the unit when it was put in operation. There is conflict in the evidence about the condition of the pipes during this period. There was testimony that they were left in the basement uncapped or that they were covered only with cloth; and also that they were sealed with either a wood plug or copper cap or "crimped", that is, "bent to the extent it was sealed off".

The unit was put in operation in May, 1952, but broke a seal and lost its Freon gas after running about two hours. Plaintiff's maintenance man, Simon Schultz, got another seal through Waddell, added new Freon gas and started it again. Two days later the compressor tore itself up, and the unit stopped again. Tureen said Mr. Nachman, Sr., was called, and he made arrangements with the Schnacke Company (manufacturers of the compressor) for a new compressor and returned the damaged one to them. (Schultz thought Waddell made these arrangements.) Six weeks, later this second compressor tore itself apart and was replaced with a third one (the second one was not returned to Schnacke); throughout the summer of 1952 the unit leaked gas and had excessive vibration. Repairs during that period were made by Consolidated. Nachman and Waddell were kept informed and Waddell came down many times to check. In September, 1952, Airco sent plaintiff "a new blower and blower housing and galvanized shafts, wheels and shafts." During that month, plaintiff's attorney wrote a letter to Nachman claiming total failure of consideration and demanding refund of the purchase price and damages; and stated that suit would be filed within one week if plaintiff was not compensated. Airco was also contacted. There was a meeting at which Nachman, Sr., Waddell, Schultz, Tureen and his attorney and representatives of Jones and Consolidated were present. "Nachman said if he would be given full control of going in and taking care of this machine and doing the job that the machine would then work efficiently." Tureen for plaintiff agreed to do that and said, "No one else was to touch it except the Nachman Company from then on."

Airco had an investigation made by its engineer, Kessler, who made the following findings, sent to plaintiff February 20, 1953:

"1. The unit, RK–50 serial #1, was purchased as a complete unit with a complete refrigeration system, all refrigerant piping connected—unit charged with freon 12.

"2. The unit, RK–50—serial #1, was split in four sections by an outside agency after leaving the factory without authorization from the factory. This action automatically voids any and all warranties expressed or implied on said equipment. Refer to the fifth paragraph of the enclosed copy of the warranty.

"3. Inspection of the inoperative compressor—serial #E4–2021 indicated that the felt suction filter liners had not been removed after system had been put into operation. There was a label on the compressor clearly indicating that these liners should be removed after approximately a week's operation. One of the suction screens had the bottom blown out, indicating the compressor had passed a considerable quantity of foreign material through the suction side or the suction side had become so clogged with foreign material that the compressor operated at a high vacuum finally pulling strainer and liner into the body.

"4. Performance of the condenser section could not be determined due to the

equipment being inoperative at the time of inspection. The appearance of the duct-work brings some question as to whether proper performance is being obtained from this section due to the possible high static created by numerous elbows and lengths of duct run."

This letter called for all inoperative parts to be sent in for inspection. Defendants had expert testimony to show that abrasive foreign material and moisture got into the unit, when it was cut up and left in the basement disassembled, damaged it and caused the trouble with the compressors. Defendants also had evidence that the unit was improperly operated by Schultz and that he did not give it proper care and maintenance. Defendants also had evidence to show that the unit could have been disassembled by unbolting and that it was not necessary to cut it with a torch.

After plaintiff received this letter, it gave Nachman the following authorizations, dated March 16, 1953, and March 30, 1953, respectively, in accordance with their earlier oral agreement:

"Nachman & Co. Inc., 1047 Big Bend, St. Louis (17). Gentlemen: This is your authorization to check, inspect and advise to apparent repairs necessary on 50 ton U. S. Airco machine located in the Majestic Hotel—City of St. Louis—subject work to be handled on a T. & M. Basis. B. H. Tureen, Pres., B. H. Tureen Hotels Inc."

"Name Majestic Hotel, Address 11th & Pine Str., Bill to Above, Equipment 50 T. U. S. Airco Mod. 9450 B Ser. No. 1. Authorization is hereby given to Nachman & Co. to repair, test & furnish all parts necessary to put above system in correct operating condition. Above to be handled on a time & material agreement. Signed S. Schultz."

Nachman did work on the unit during the spring and summer of 1953 and furnished material and services for which the jury found for it on its counterclaim against plaintiff for $2,222.17. In June, 1953, the third compressor was found in bad condition by Nachman's workmen, who said it had been improperly installed. Schultz got a new one (the fourth) by making a weekend trip to the Schnacke factory in Indiana. This fourth compressor was in the unit at the time of the trial. The unit was operated during 1954 and 1955; but plaintiff claimed it leaked gas and was unsatisfactory, and it was abandoned in June, 1956. However, this suit was commenced in June, 1954, and another company was called to furnish gas and service the unit after that time.

During 1953 plaintiff had continued to insist that Airco do something about the unit, going to Minneapolis to see Mr. Feinberg, president of Airco, and finally received a letter from Kessler (who had made another inspection) dated July 15, 1953, which stated:

"During our discussion, I told you that under no circumstances would we absorb any of the repair charges with respect to replacement of the first compressor and any other work that had to be done on the unit at that time. We went over and above the warranty in allowing you full credit for the compressor that was returned at that time. You will remember that this equipment was split in four sections, and there was considerable foreign material in the system which caused the first compressor failure. This, of course, is something over which we have no control since the equipment was originally shipped in one piece as a complete refrigeration system and theoretically as pointed out in previous correspondence the warranty would have been void. We, however, felt that you were entitled to some consideration in this matter; consequently, we agreed to extend full credit for the compressor being returned and keep this unit within warranty.

"With respect to the last replacement which was made, as previously indicated, this matter was discussed with Mr. Feinberg, and we have agreed that we will accept the charges for the replacement of this

compressor, the charges for adding the additional bracing, and the charges for repairing this coil when the line broke. We will deal through Mr. Waddell and Nachman on this matter. Also, we will extend the one year warranty from date of installation of this replacement compressor."

The evidence was that Nachman was not informed about this extension of the time of the warranty. Plaintiff had expert testimony of S. J. Shure, an air conditioning engineer, that the unit was poorly engineered and its parts improperly installed in the unit; that it had improper piping with right angle connections, instead of a wide sweep bend, which caused excessive vibration; that the Schnacke compressor did not have proper balance so that "when these pistons, connecting rods and their bearing assembly were connected to the crankshaft the machines did not operate smoothly" and caused "severe vibration"; and that the unit was designed for 40-ton capacity but was speeded up by a larger motor to obtain 50-ton capacity, which he said caused it to deteriorate, crack and break. He gave his opinion that the damage to the unit (which he examined in 1956) was not caused by foreign material entering it from outside but mainly by excessive vibration due to improper construction, which he said broke loose and ground up parts of the unit. He also stated his opinion that the cutting up of the unit and reassembling it did not in any way contribute to the breakdowns. He further stated that he advised plaintiff that the cost of placing the unit in condition to operate properly, in 1956, would probably be more than a new good unit would cost. Other facts will be stated in connection with the rulings hereinafter made.

The way the case was submitted explains to some extent what might seem to be inconsistent verdicts herein. Instruction 1 submitted the theory of an implied warranty by Nachman and the breach thereof and authorized a verdict against Nachman only (Count I). Instruction 2 also authorized a verdict against Nachman only on the theory of total failure of consideration (Count II). Instruction 5 (also under Count I) submitted the theory of an express warranty by Airco that the unit "was free from defects of material and workmanship" on which Nachman was also liable and authorized a verdict against Airco and Nachman jointly. (Instructions 3 and 4 covered measure of damages.)

Instruction 9 authorized a verdict for Nachman against plaintiff on its counterclaim up to $2,222.17 on a finding of a written contract therefor performed by Nachman. Instruction 7 authorized a verdict for plaintiff on this counterclaim if the jury found the services were provided by Nachman "pursuant to the performance of its guarantee" of the unit or if the jury found the work and materials "were ineffective in causing said machine to continue to operate". (Instruction 6 authorized a verdict for Nachman on Count I if improper installation or maintenance by plaintiff caused failure of the unit, and Instruction 12 authorized a verdict for Nachman on Count II if the unit was fit for any useful purpose.) Instruction 8 told the jury that if they found against Nachman on an express warranty (Count I), then it was entitled to a verdict against Airco on the same warranty in the same amount. Instruction 10 gave the same direction in the event of a verdict against Nachman on total failure of consideration (Count II). The court refused Nachman's instruction to submit the issue waiver of breach of warranty by plaintiff by making the contract with Nachman for work on the unit on a time and material basis and its performance thereof. Airco requested no instructions.

As noted, the jury found for plaintiff against both Nachman and Airco on Count I for $12,450.26 and for Nachman against Airco for the same amount; and found against plaintiff and for both defendants on Count II (total failure of consideration). The jury also found for Nachman against plaintiff on its counterclaim for $2,222.17. Thus under the instructions (particularly 1, 5 and 7) the jury must have found

against plaintiff and for Nachman on the issue of an implied warranty and found against Nachman only on the theory of liability on the express warranty with Airco.

■ Nevertheless, although assigning no error in instructions, plaintiff contends that Nachman should be held liable on an implied warranty of fitness, citing such cases as Dubinsky v. Lindburg Cadillac Co., Mo. App., 250 S.W.2d 830; Davies v. Motor Radio Co., Mo.App., 236 S.W.2d 409; Hunt v. Sanders, 313 Mo. 169, 281 S.W. 422; Hunter v. Waterloo Gasoline Engine Co., Mo. Sup., 260 S.W. 970; National Cash Register Co. v. Layton, 207 Mo.App. 454, 232 S.W. 1091. Nachman contends that its only obligation was as stated in its written contract to furnish a new, factory fresh air conditioning unit with the manufacturer's 12 months' warranty; and that it did so. Because of the view we take, it is not necessary to decide these questions. This is true because we find that Nachman's theory of estoppel (usually referred to as waiver of warranty) is applicable and that, even if the warranty claimed by plaintiff could have been implied against Nachman, any claim of a breach thereof was waived by plaintiff making the subsequent contract with Nachman for work on the unit on a time and material payment basis. We think this would also be true of any original liability on the express warranty of Airco. A breach of warranty "may be waived by conduct inconsistent with its assertion." 77 C.J.S. Sales § 344, p. 1243; see also 46 Am.Jur. 855, Sec. 730. What could be more inconsistent with a claim of warranty against Nachman than employing him, on a time and material payment basis, to place the unit in good operating condition? This seems to us to be particularly true under the circumstances of this case; namely, that Nachman was not permitted to install the unit as originally intended; that, after threatening to sue Nachman for refund of the whole purchase price, plaintiff instead made a contract to pay Nachman on a time and material basis to repair and recondition the unit; and that, prior to the time of making the

time and material contract with Nachman, plaintiff had received the detailed findings of Kessler to the effect that the trouble with the unit was due to the improper action of the installer, employed by plaintiff, in cutting up the unit and then prior to its installation alowing it to remain exposed to dust and dirt without adequate protection so that it was damaged and its efficiency impaired. Although there are cases finding a waiver of warranty as a matter of law, we have found no other case in which there was such a positive act more completely inconsistent with a claim of breach of warranty as employing and agreeing to pay the party claimed to be liable for time and material necessary to place the warranted machine in operating condition. In Lucas v. Burt W. Kemmerling Co., Ohio App., 115 N.E.2d 17, 18, in an action for damages for breach of an implied warranty of a truck, it was held that plaintiff who had agreed to pay one-half of the cost of repairs of the truck could not claim damages as to the value of the truck by reason of the claimed breach of warranty, saying: "The plaintiff having voluntarily agreed to pay, and having paid one-half of the cost of repair on the last two occasions when the truck was returned for repairs, cannot now claim damages for any alleged breach of warranty." In Bridges v. Shapleigh Hardware Co., 186 Ark. 993, 57 S.W.2d 405, it was held that continuing to make payments on radios purchased long after making complaints about defects would be sufficient to support a finding of waiver. See also Myers v. Cole, 200 Ark. 959, 141 S.W.2d 840. In Newman v. Preston Motor Co., 250 Ky. 818, 64 S.W.2d 153, 154, it was held that the buyer of an automobile, by making an agreement authorizing a private sale of it, with the proceeds to be applied on the purchase price, recognized the seller's right to sell under his chattel mortgage and recover the deficiency between the sale price and the purchase price. The court held "this was a waiver of any claim for damages for the alleged breach of warranty." See also California Press Mfg. Co. v. Stafford Packing Co., 192 Cal. 479, 221 P. 345, 32 A.L.R. 114; Coleman v. Car-

ter, 77 Idaho 210, 289 P.2d 932, and cases cited; Annotations 34 A.L.R. 547; 106 A.L.R. 172; 41 A.L.R.2d 1185. In this case, the contract (for payment on time and material basis) was shown by plaintiff's evidence and the jury found plaintiff liable on it. (As hereinabove noted they must have also found that Nachman did not furnish services pursuant to a "guarantee as to fitness" as submitted in Instruction 7.) Furthermore, Airco extended its express warranty for another year after plaintiff and Nachman had made this contract and Nachman was working under it; and there was no evidence that Nachman agreed to such extension or was even informed of it. Our conclusion is that making this admitted contract, under the circumstances of this case, was conduct inconsistent with a claim of warranty of any kind and constituted a waiver thereof. We, therefore, hold that Nachman was entitled to a directed verdict on that issue.

▮ On plaintiff's appeal from Nachman's judgment on its counterclaim for $2,-222.17 for this work and material, plaintiff claims that plaintiff's promise to pay Nachman for this was without consideration. Plaintiff's argument is "that it was the obligation of Nachman to remedy the defects in the refrigerating unit in furtherance of its warranty"; and therefore a promise to pay Nachman for what it was already under a duty to do would be without consideration, citing Rexite Casting Co. v. Midwest Mower Corp., Mo.App., 267 S.W.2d 327; Lingenfelder v. Wainwright Brewery Co., 103 Mo. 578, 15 S.W. 844; Mt. Vernon Car Mfg. Co. v. Hirsch Rolling Mill Co., 285 Mo. 669, 227 S.W. 67; Vrooman v. Burdett, 336 Mo. 1181, 83 S.W.2d 95. However, as noted there was certainly a dispute about Nachman's obligation; and there was a real substantial basis for it, in view of the fact that Nachman was not permitted to install the unit, the treatment of the unit by the company that did install it, and the findings of Kessler as to the cause of the trouble which had been communicated to plaintiff before

it made the new contract with Nachman for its work on the unit. Under these circumstances, it cannot be held there was no consideration for plaintiff's promise to pay Nachman for this work and material. It is well settled that the compromise of a disputed claim is sufficient consideration to support a promise. Duvall v. Duncan, 341 Mo. 1129, 111 S.W.2d 89; see also Zinke v. Knights of the Maccabees of the World, 275 Mo. 660, 205 S.W. 1; Halloway v. Mountain Grove Creamery Co., 286 Mo. 489, 228 S.W. 451; 11 Am.Jur. 249, Sec. 4. We think these principles are applicable to this situation.

▮ Plaintiff also says that, even if this contract was supported by consideration, Nachman was not entitled to recover on its counterclaim because Nachman's services were entirely futile and worthless. This issue was submitted to the jury by Instruction 7 which authorized a verdict for plaintiff on Nachman's counterclaim if they found "that said work, labor and materials so furnished by said defendant were ineffective in causing said machine to continue to operate." The jury found against plaintiff on this issue, and there was sufficient substantial evidence to support such a finding. In addition to the other evidence hereinabove noted, Nachman's employee, who supervised the work under this contract, stated what was found wrong with the unit and what was done to remedy it. The unit was used throughout 1953 and also 1954 and 1955; and no change was made for the air conditioning of plaintiff's premises until 1956. These facts and also the fact that, at the time of the trial, plaintiff was still using parts of the unit (motor and blower) demonstrate there is no merit in plaintiff's contention that it was entitled to have its motion for judgment notwithstanding the verdict or for new trial as to Count II sustained, on the theory that the unit was entirely worthless. Therefore, Nachman's judgment against plaintiff on its counterclaim, and the judgment against plaintiff on Count II must be affirmed; and plaintiff's

judgment against Nachman on Count I must be reversed.

■ Plaintiff concedes that its recovery against Airco must be on its express warranty because this excluded "all other warranties and liabilities expressed or implied". However, plaintiff claims the warranty that Airco's "products are free from defects of material and workmanship" is broad enough to cover more than the subsequent expressed obligation "as a part of this warranty" to "replace or repair" parts returned and found "to have been defective". Plaintiff says if the obligation to "replace or repair" parts is a *part* of the warranty that means it is not the entire warranty; and says "the key to the problem is the word 'workmanship'." Plaintiff says: "The evidence clearly shows that in this case the failure of the unit had no relation whatsoever to defective parts, but was caused by defective design and application of erroneous structural principles. In other words, the workmanship of the complete unit was defective although each part was otherwise perfectly free from defect." Plaintiff bases this on its expert testimony "that the speeding up of an ordinary 40-ton compressor to deliver 50 tons of cooling and the defective manner in which the piping was installed were the entire cause of the trouble." On the other hand, Airco says that read and construed as a whole "the warranty is an agreement to replace or repair any part of the unit made by U. S. Airco which is defective in material or in the workmanship of such part"; and that "in no event shall U. S. Airco's liability exceed the cost of parts required to correct defects." While we think Airco's construction is too narrow, we think plaintiff's construction is too broad. Plaintiff says that its expert testimony "proved nothing as to the condition of the parts but was severely critical of the workmanship"; and shows that "the reason the unit failed was because of defective engineering or workmanship". What plaintiff is trying to do is to construe this express warranty as an implied warranty of fitness which was specifically excluded by the terms of the warranty actually made. Plaintiff relies on an implied warranty case, Davies v. Motor Radio Co., Inc., Mo.App., 236 S.W.2d 409, saying it "held that special warranties as to parts of an assembled unit do not conflict with an implied warranty that the machine, as assembled, will operate satisfactorily"; and that "so, here, the parts of the unit may be completely free of defect, yet as a whole the machine may not operate successfully."

The term "workmanship" in a warranty has been considered in several cases. In Wall v. Britton Stevens Motors Co., 251 Mass. 517, 146 N.E. 693, 694, 43 A.L.R. 647, the claim made was that the truck sold had an inadequate engine; and the warranty was "against defective material and workmanship * * * to the extent that they will furnish free f. o. b. factory new parts in exchange for defective parts". The court held that a motion for directed verdict for the seller should have been granted, saying "there is no affirmation * * * of the quality of the materials or condition of the truck; nor did the defendant promise that it could be satisfactorily operated"; and said the defendant only undertook to furnish free new parts in exchange for defective parts. While the language of that warranty may be more restricted than the one in this case, it does show that "workmanship" does not have the broad meaning claimed by plaintiff herein. See also Lambert v. Jenkins, 112 Va. 376, 71 S.E. 718; Ford Motor Co. v. Switzer, 140 Va. 383, 125 S.E. 209; Scott v. Industrial Finance Corp., Tex.Civ.App., 265 S.W. 181; Fulwiler v. Daniel, Tex.Civ. App., 279 S.W. 603; 98 C.J.S. p. 836; 71 C.J. 180. In another Massachusetts case, American Locomotive Co. v. National Wholesale Grocery Co., 226 Mass. 314, 115 N.E. 404, 405, L.R.A.1917D, 1125, in which there was an agreement to replace any parts breaking in one year "because of defective material or workmanship", bearings of an automobile burned out because of a crack in the crankcase, although there was no defect in the bearings. The court said: "Construing this stipulation with reference to the subject matter of the contract, the obligation

of the plaintiff, to restore or deliver defective parts, was not confined merely to parts which were themselves defective. It extended to all the machinery which broke ·down, because of defects existing in the material or workmanship. * * * The parties contracted for the sale and purchase of an automobile. If the bearings burned out it became equally inefficient, whether the defect causing the condition was in the bearings or in other parts of the machinery." In Birmingham Motor Co. v. Norwood Transportation Co., 16 Ala.App. 572, 80 So. 146, 147, there was broader language ("free from defective material or workmanship until each truck has been run a distance of thirty thousand miles" with agreement to replace); and it was held to cover not only defects existing at the time of sale and developed within such distance but also defects developing by use and wear within that distance. The court held the language of the warranty to be reasonably susceptible of the latter construction, applying the rule that "all doubt will be resolved against the party who has drawn contract." The Supreme Court of Canada, in Hart-Parr Co. v. Wells, 57 Can.S.C. 344, 346, held that the term defect "in workmanship or material" of a tractor engine applied "only to the warranty that *the engine was well made* and of good material", and not to a warranty that it would develop certain horsepower. (Emphasis ours.) This seems to us to be as good a definition of "workmanship" as any we have found.

[7] Airco's warranty was not specifically limited to replacing or repairing parts as was true in some of the cases hereinabove cited. Instead that obligation is stated to be only *part* of its warranty. At least the first sentence is not clear as to its intent and, as some of the above cited cases hold, in its interpretation all doubt should be resolved against Airco since it prepared it. While we cannot accept plaintiff's contention that this warranted the unit to be designed and constructed on the best, latest or most efficient engineering or structural principles (certainly not those claimed to be best by plain-

tiff's expert) or was as broad as a warranty of fitness, nevertheless we do think this was a warranty that the unit was well made on the design and engineering principles adopted by Airco. We also believe that plaintiff's evidence that the unit leaked gas, vibrated excessively, broke off and ground up some of its parts and broke down frequently was substantial evidence that it was not well made. Of course, Airco claimed all trouble was due to the cutting up of the unit, its lack of care before installation, its faulty installation and its improper maintenance, but that was an issue for the jury. However, that issue was not properly submitted to the jury by Instruction 5 (the only instruction authorizing a verdict against Airco) which authorized a verdict on breach of express warranty. This instruction only required findings of breakdowns and other faulty operation of the unit, without requiring any finding that this was due to fault or breach of warranty by Airco and was not due to improper treatment, care and maintenance of the unit by its installers and by plaintiff. Plaintiff says this instruction tells the jury, "as a matter of law, that the breakdown of the machine 'under the circumstances and in the manner described in the evidence', if so found, constituted a breach" of the express warranty. Plaintiff overlooks the fact that some of the circumstances described in the evidence showed mistreatment, faulty installation and improper maintenance. This seems to submit a theory of absolute liability if the unit did not work properly, regardless of the cause, and we hold it was positive misdirection. Furthermore, Instruction 3 on measure of damages on breach of express warranty was erroneous in authorizing recovery of the entire purchase price of the unit. Plaintiff did not seek to·rescind·but instead chose to keep and use the unit and sue for damages. As we·have.noted, the evidence did not justify a finding that the unit was entirely worthless.

The judgment for Nachman on its counterclaim against plaintiff is affirmed; the judgment for plaintiff against Nachman for damages is reversed; and the judgment for

plaintiff against Airco for damages is reversed and the cause remanded for retrial of the issues between plaintiff and Airco.

All concur.