393 F.2d 907
 SOUTHERN AGENCY COMPANY, Sterling G. Phillips, Ralph L.
Markus and Thomas B. Maue, Appellants,
v.
LaSALLE CASUALTY COMPANY, J. S. Finke, Bess Finke, Bess
Finke and Ralph Bertel, Trustees for Myrna M.
Heckler d/b/a United Investment Company,
Appellees.
SOUTHERN AGENCY COMPANY, Sterling G. Phillips, Ralph L.
Markus and Thomas B. Maue, Appellants,
v.
LaSALLE CASUALTY COMPANY, National Industries, Inc., F. G.
Orner and John Fahrenbach, Appellees.
 Nos. 18860, 18861.
 United States Court of Appeals Eighth Circuit.
 April 23, 1968, Rehearing Denied May 7, 1968.
 
 Ralph L. Markus, Clayton, Mo., for appellants, Southern Agency Co. and others; Thomas B. Maue, Clayton, Mo., on the brief.
 Gerald M. Smith, of Guilfoil, Symington, Montrey & Petzall, St. Louis, Mo., for appellees, LaSalle Casualty Co., and others; Gerhard J. Petzall, St. Louis, Mo., on the brief.
 Before BLACKMUN, GIBSON and HEANEY, Circuit Judges.
 HEANEY, Circuit Judge.
 
 
 1
 This case involves appeals from two judgments entered in related actions.[1] We dismiss for want of jurisdiction the appeal (No. 18,861) from the judgment of the District Court dismissing with prejudice the action brought by the Southern Agency Company[2] against the LaSalle Casualty Company.[3]
 
 
 2
 In appeal No. 18,860, we affirm the judgment of the District Court insofar as it awards LaSalle a judgment in the sum of $11,925.00, and taxes the cost of a special master against Southern, but vacate that part of the judgment which awards the intervenor plaintiff, United Investment Company, the sum of $41,622.38, and remand for action consistent with this opinion.
 
 
 3
 On August 29, 1963, Southern entered into an agreement with LaSalle under which Southern was named the managing agent for LaSalle in the St. Louis area, and was authorized to write substandard automobile liability insurance through LaSalle.
 
 
 4
 The agreement between the parties was a rather complex one which need not be delineated here. Generally, its effect was to authorize Southern to write the insurance in the name of LaSalle, to collect the premiums from its two hundred and fifty brokers making the sales and to adjust losses. It obligated Southern to hold the premiums collected in trust for LaSalle and to remit amounts due to LaSalle within fifty-five days of being billed. It permitted Southern to receive a provisional advance commission and established the basis of computing final commissions (essentially eighty-five percent of the earned premium, less: losses, premium taxes, provisional commissions and other miscellaneous items). It required LaSalle to pay all claims.
 
 
 5
 In midsummer, 1965, Southern encountered difficulties in meeting its obligations to LaSalle when due. LaSalle terminated the agency agreement on August 17th on the grounds that Southern was in default to it on the payment of premiums.
 
 
 6
 On September 7, 1965, Southern brought an action in Cole County, Missouri, against LaSalle for $3,200,000, alleging the wrongful termination of the agency contract (Appeal No. 18,861). It claimed that LaSalle had wrongfully manipulated the account so as to place Southern in the position of being unable to meet the premium payments when due. LaSalle subsequently removed the action to Federal District Court.
 
 
 7
 On September 8th, LaSalle commenced an action in Federal District Court for the Eastern District of Missouri (Appeal No. 18,860). It claimed that Southern was using the premiums collected from brokers for payment of its general obligations, and that such use was in violation of a trust imposed by Missouri law. It requested:[4] (1) that a temporary restraining order and temporary injunction be issued prohibiting Southern from in any way disposing of its assets pending a final determination of the amount of trust funds held by Southern for LaSalle, and requiring Southern to deposit all premiums subsequently received in a trust account under the control of the court; and (2) an accounting of the premiums due it and a judgment for the amount due. LaSalle posted a bond for $100,000. The court granted a temporary restraining order substantially as requested and set September 18, 1965, for a hearing on the temporary injunction. This hearing was subsequently postponed to October 21, 1965.
 
 
 8
 Southern had routinely assigned the premiums due from its brokers to United. It made this arrangement partly because it was required to remit to LaSalle in a shorter period of time than its brokers were remitting to it. When United learned of LaSalle's petition, it filed, on September 28th, a complaint in intervention alleging that the proceeds of the assigned accounts receivable were its property and were subject to the imposition of a trust. It asked that the court refrain from issuing the injunction asked by LaSalle or, in the alternative, that the court exclude from the effect thereof the proceeds from the accounts receivable pledged to United. (A hearing on the intervenor's complaint was held on March 23, 1966.)
 
 
 9
 In a thirteen-hour negotiating session on October 20, 1965, Southern and LaSalle negotiated a 'stipulation and agreement' 'for the purpose of resolving the issues here and in other causes between the parties.' United was not a party to it.
 
 
 10
 The 'stipulation' established a method of computing a loss reserve figure and provided, in paragraph four, that certain other sums would be deemed to be correct as of August 31, 1965: the unearned premium reserve, $190,000; the written premiums, $845,000; and earned premiums, $656,000; and premiums due, $102,000. It further provided:
 
 
 11
 '6. * * * Premiums due LaSalle Casualty Company * * * shall be adjusted by * * * such other appropriate credits and charges as may reflect any policy transactions subsequent to August 31, 1965 and prior to November 18, 1965. '7. The figures given in Paragraph 4 and Paragraph 6 in this stipulation are warranted to be accurate within 10% Or within $40,000.00, whichever is lower, by LaSalle Casualty Company. At any time within 90 days following the execution of this stipulation the defendants shall have the right, at their own expense, to verify such figures through an independent audit by Ernst & Ernst. * * * Should upon verification any of the figures referred to here be inaccurate beyond the limits contained within this warranty and the defendants are prejudiced by such error then the defendants shall have the right to recover back from LaSalle Casualty Company the amount of error in the specific figures which are the subject of warranty.'
 
 
 12
 The 'stipulation' provided that the parties would resolve their differences by using the 'deemed' amounts, and stated that if the parties were unable to agree on the loss reserve, a third party would be named to arbitrate the matter.
 
 The 'stipulation' finally provided:
 
 13
 'The judgment to be entered * * * shall be a final determination of all liabilities and obligations existing between the parties hereto arising out of or in any way connected with their private dealings, whether such liabilities exist in tort or contract or whether such liabilities and obligations arise out of the institution of such action. Specifically * * * within 5 days after entry of a judgment pursuant to this paragraph (Southern) will dismiss * * * with prejudice (its action against LaSalle).'
 
 
 14
 Southern filed a motion on December 2, 1965, to strike the 'stipulation' on the grounds that its execution had been induced by fraud on the part of LaSalle. It contended that the premiums due account, deemed to be $102,000, had been overstated by LaSalle by $34,000.
 
 
 15
 A hearing on Southern's motion to strike was held on December 10, 1965. Expert witnesses for Southern testified that LaSalle had failed to allow it certain credits resulting from policy cancellations. They conceded, however, that it was impossible to determine from an examination of the cancellations alone whether, in fact, the premiums due account had been overstated. It was also developed that Southern had not requested Ernst & Ernst to conduct an audit,[5] and that Southern was in possession of records indicating the precise status of the credits three months before the 'stipulation' was signed.
 
 The trial court concluded:
 
 16
 'It is unbelievable to the Court that the defendants, who are experienced insurance people, could seriously allege at this state in the game that they were misled or that fraud had been committed upon them. Their motions to strike will be overruled.'
 
 
 17
 The parties then attempted to resolve their dispute in accordance with the terms of the 'stipulation' but were unable to do so largely because they were unable to agree as to the amount of appropriate credits and charges reflecting policy transactions between August 31, 1965 and November 18, 1965. This effort failing, the matter was submitted to the District Court on March 21, 1966.
 
 
 18
 On June 6th, the court appointed Peat, Marwick, Mitchell and Company as special master to determine the amount of adjustments to be made to the stipulated figures in paragraph six of the 'stipulation' for transactions in the period August 31st to November 18th, with the compensation of the master to be fixed by the court and taxed as costs. The master filed its report on October 6, 1966. It found that Southern was entitled to a credit of $18,333.96 for cancelled policies.
 
 
 19
 At a hearing on a motion to approve the master's findings and to consider objections to its report, it was established that the order of the court appointing the special master had been interpreted by the master and the parties as requiring the special master to credit all cancellations mailed before November 18th, irrespective of the date the cancellations were effective. It further appeared that the special master allowed credits for those pre-August 31 transactions that would not have shown up in the normal course of accounting.[6]
 
 
 20
 The trial court entered its findings of fact and conclusions of law and an order for judgment on February 2, 1967: (1) it incorporated in the findings its earlier findings of December 17, 1965, which had denied Southern's motion to strike the 'stipulation' on the basis of fraud and found that pursuant to the 'stipulation' and the findings of the master, La Salle was entitled to a judgment in the sum of $11,925.00; (2) it taxed the cost of the master in the sum of $14,501.42 to Southern; (3) it found that the premiums collected by Southern from its brokers were trust funds under Missouri law and were the property of LaSalle, and that the assignment of the premiums to United had been done without LaSalle's knowledge or consent, and was invalid against it; (4) it determined that Southern was indebted to United in the sum of $41,622.38, and awarded a money judgment to United in that amount.
 
 
 21
 The court entered a separate order for judgment dismissing Southern's action again LaSalle for wrongful termination of the agency contract on the same date.
 
 
 22
 On appeal, Southern urges that the trial court erred: (1) by finding that the premiums collected by Southern are trust funds and the property of LaSalle, (2) by refusing to set aside the 'stipulation and agreement,' (3) by appointing a special master and taxing the cost of the master against Southern, (4) by dismissing Southern's action against LaSalle, and (5) by awarding United a money judgment.
 
 
 23
 I. THE TRIAL COURT DID NOT ERR IN FINDING THAT PREMIUMS COLLECTED BY SOUTHERN ARE TRUST MONIES AND THE PROPERTY OF LA SALLE.
 
 
 24
 The trial court based its holding on Mo.Rev.Stat. 375.290 (1959), V.A.M.S.:
 
 
 25
 '375.290. Agent is trustee of company-- criminal liability of agent '1. Any person who shall be appointed, or who shall act as agent for any insurance company within this state, or who shall, as such agent, solicit applications, deliver policies or renewal receipts and collect premiums thereon, or who shall receive or collect moneys from any source or on any account whatsoever, as such agent, for any insurance company doing business in this state, such person shall be held responsible in a trust or fiduciary capacity to such company for any money so collected or received by him for such company.'
 
 
 26
 It was correct in so doing.
 
 
 27
 As we read the court's decision, the trust is imposed on premiums collected by Southern but only to the extent necessary to satisfy its money judgment in the sum of $11,925.
 
 
 28
 Southern argues that the trust relationship was abrogated because LaSalle consented to the factoring arrangement with United, and because it acceded to the establishment of a debtorcreditor relationship.
 
 
 29
 The District Court reviewed conflicting evidence on both contentions and resolved the conflicts in favor of LaSalle. Its findings on these issues are supported by substantial evidence, and will not be disturbed by us.
 
 
 30
 Southern cites Twin City Fire Ins. Co. v. Green, 176 F.2d 532 (8th Cir. 1949), to support its contention. There we sustained a District Court decision holding that an insurance company had been so lax in requiring a strict fiduciary accounting that it had given up its right to the trust it would have otherwise been entitled to under 375.290.
 
 
 31
 In our view, Green is not controlling. There, the insurance company knew the agent was factoring the premiums receivable and, here, the trial court found that LaSalle was not aware of Southern's arrangement with United.
 
 
 32
 There remains the question of whether the trust was abrogated by the 'stipulation' between the parties. It provided for an entry of a money judgment in favor of the prevailing party and stated:
 
 
 33
 'The judgment entered pursuant to this paragraph shall be a final determination of all liabilities and obligations existing between the parties hereto arising out of or in any way connected with their prior dealings, whether such liabilities and obligations exist in tort or contract or * * * arise out of the institution of this action.'
 
 
 34
 While LaSalle had a right to relinquish its rights under 375.290, we do not believe it did so. Waiver of such an important right should not be lightly inferred, Twin City Fire Ins. Co. v. Green, supra, and there is no direct testimony indicating that the parties intended the 'stipulation' to have this effect.
 
 
 35
 A reading of the entire 'stipulation' leaves us with the distinct impression that the 'stipulation' was intended as a means of settling the amount due the prevailing party and not as a relinquishment of the right to assert a trust on such amount if LaSalle turned out to be the prevailing party.
 
 
 36
 II. THE TRIAL COURT DID NOT ERR IN REFUSING TO SET ASIDE THE 'STIPULATION.'
 
 
 37
 Southern urges numerous grounds for setting aside the 'stipulation,' the more important ones being: (1) fraud, (2) mistake, and (3) lack of consideration.
 
 
 38
 It is clear that the 'stipulation' may be set aside upon 'clear proof of fraud or mistake.' Caneer v. Kent, 342 Mo. 878, 119 S.W.2d 214, 216 (1938). To set it aside on the basis of fraud, the elements of fraud under Missouri law must be established. We set these elements forth in Jones & Laughlin Steel Corp. v. Sedalia Ind. Loan & Inv. Co., 315 F.2d 58, 61 (8th Cir. 1963):
 
 
 39
 '* * * 1, a representation; 2, its falsity; 3, its materiality; 4, the speaker's knowledge of its falsity or ignorance of its truth; 5, his intent that it should be acted upon by the person and in the manner reasonably contemplated; 6, the hearer's ignorance of its falsity; 7, his reliance on its truth; 8, his right to rely thereon; 9, and his consequent and proximate injury. * * *'
 
 
 40
 Accord, Foster v. Dwire, 51 N.D. 581, 199 N.W. 1017 (1924).
 
 
 41
 In our view, the trial court correctly decided that the elements to establish fraud were not present. Southern failed to prove that the premiums due account was other than was represented to be ($102,000). While Southern's expert witnesses testified that credits for cancelled policies totaling some $34,000 appeared in the records of Southern but not in those of LaSalle, they did not assert that this failure resulted in a misstatement of net premiums due. A strong inference may be drawn that the error, if any, did not exceed the ten per cent as Southern did not press for a full audit of the premiums due account as it was entitled to do under the warranty provision.
 
 
 42
 Southern also failed to establish its right to rely on the representation of the premiums due account furnished by LaSalle. The record is clear that Southern had in its possession the information with respect to the credits for cancelled policies at least three months before it entered into the 'stipulation' with LaSalle. It was represented in the settlement negotiations by competent counsel and officers of the company. In the words of the District Court, 'It is unbelievable to the Court that the defendants, who are experienced insurance people, could seriously allege at this state in the game that they were misled or that fraud had been committed upon them.'
 
 
 43
 Southern argues that the trial court's decision that no fraud existed was based on an erroneous view of the evidence. It quotes from a portion of the trial court's decision on December 17, 1965, to support this contention:
 
 
 44
 '* * * Even the testimony as to a possible discrepancy which defendants gave is within the margin of error which the plaintiff estimated in the stipulation of settlement and warranted to be accurate within 10%. * * *'
 
 
 45
 It argues that as the premiums due account was deemed to be $102,000 and the variance was actually $34,000, the margin of error exceeded the allowable variation of ten per cent ($10,200).
 
 
 46
 It appears that the District Court may have misunderstood the agreement. It is equally clear, however, that the District Court would have reached the same decision had it read the 'stipulation' as we do, i.e., that an error of $34,000 in cancellation credits (one aspect of the premiums due account) does not establish that the premiums due account was off by more than ten per cent.
 
 
 47
 Southern contends that the court erred in not considering mistake as a basis for setting aside the 'stipulation.' Clearly, a document such as the 'stipulation' may be attacked on a clear proof of mistake. e.g., Caneer v. Kent, supra (see cases cited therein). However, Southern failed to allege mistake in its petition to set aside the 'stipulation' or to assert the alleged mistake at the hearing. In Hinshaw v. New England Mut. Life Ins. Co., 104 F.2d 45, 48 (8th Cir.), cert. denied, 308 U.S. 583, 60 S.Ct. 106, 84 L.Ed. 488 (1939), this Court applying Missouri law, held: 'No mistake having been pleaded nor claimed in the lower court, * * * there is no basis for urging the claim here.' As we have already noted, this was the situation in this case.
 
 
 48
 Furthermore, we note that, in paragraph seven, it specifically provided that Southern could correct errors in the 'deemed' accounts by having an audit made by Ernst & Ernst. This Southern failed to do. It argues that it should be excused from this failure because it learned, after entering into the 'stipulation,' that Ernst & Ernst had a fiduciary relationship with LaSalle or its principal stockholders and was thus not an impartial, independent accountant. This argument loses much of its validity in the face of the fact that Southern did not request the court to name another independent, competent accounting firm to make the accounting. The court indicated that it would have been willing to do so. Indeed, one is left with the impression, from reading the entire record, that Southern was reluctant to have a complete and detailed accounting made and elected, for reasons of economy, to rely exclusively on the variance in the 'cancellation credits' to establish fraud.
 
 
 49
 Finally, Southern failed to establish mutual mistake. To do so, it was obligated to establish: that there was a misconception of facts regarding the 'premiums due' account; that that fact was material; that it was relied upon to the detriment of Southern; and that Southern's reliance was justifiable. See, Brown v. Fagan, 71 Mo. 563 (1880); Vorchetto v. Sappenfield, 223 Mo.App. 460, 14 S.W.2d 685 (1929); Christy v. Scott, 31 Mo.App. 331 (1888); Restatement of Estitution 6, 7, 9 (1937). Southern failed to establish any misconception regarding the 'premiums due' account and failed to establish that reliance would have been justified in the light of the fact that they could have themselves determined the status of the account.
 
 
 50
 Southern argues that the 'stipulation is without consideration because LaSalle got everything it requested and gave up nothing. Such a contention is totally without merit. LaSalle agreed to a method of computing certain accounts and agreed that others would be deemed to be specific amounts. Furthermore, it agreed that the deemed figures would not be altered even if subsequently found to be misstated to the benefit of Southern. LaSalle's forebearance to prove that the accounts were other than as agreed to in the 'stipulation' is sufficient consideration. E.g., Charles F. Curry and Company v. Hedrick, 378 S.W.2d 522 (Mo.Sup.1964); B. H. Tureen Hotels, Inc. v. Nachman & Company, 317 S.W.2d 422 (Mo.Sup.1958).
 
 
 51
 III. THE COURT DID NOT ERR IN APPOINTING A SPECIAL MASTER, IN LIMITING ITS AUDIT TO THE PERIOD AFTER AUGUST 31, 1965, AND IN TAXING COSTS OF THE MASTER TO SOUTHERN.
 
 
 52
 Reference to a master is within the discretion of the District Court. Schwimmer v. United States, 232 F.2d 855 (8th Cir.), cert. denied, 352 U.S. 833, 77 S.Ct. 48, 1 L.Ed.2d 52 (1956). The discretion is particularly broad where difficult accounting problems are involved. American Cyanamid Company v. Ellis-Foster Company, 298 F.2d 244 (3d Cir. 1962), Mitchell v. Mitchell Truck Line, Inc., 286 F.2d 721 (5th Cir. 1961); Troyak v. Enos, 204 F.2d 536 (7th Cir. 1953); Barron & Holtzoff, Federal Practice and Procedure, 1162 n. 13 (1961). That such problems were present in this case is not open to serious question. It was necessary to review every transaction in the disputed period to strike the proper balance between the parties. This review could be best accomplished by a master.
 
 
 53
 It was proper for the District Court to limit the master's audit to the post-August 31, 1965, period. The 'stipulation' authorized Southern to obtain an audit for the earlier period by request, and Southern, as we have previously pointed out, failed to avail itself of that privilege. We would also note that the District Court offered to extend the audit to the earlier period if Southern would post a bond to guarantee payment of costs, and Southern declined to do so.
 
 
 54
 Finally, no error was committed by taxing the costs of the special master to Southern. This matter is also one within the discretion of the trial court. Fed.R.Civ.P. 53(a); Bomze v. Nardis Sportswear, 165 F.2d 33 (2d Cir. 1948). Cf., Fed.R.Civ.P. 54(d). We find no abuse of that discretion. Indeed, the 'stipulation' provided that 'court costs' should be added to the judgment entered in the action, and the master's fee and expenses were properly included in such costs.[7]
 
 
 55
 IV. A TIMELY APPEAL (18,861) WAS NOT TAKEN FROM THE TRIAL COURT'S DISMISSAL OF SOUTHERN'S ACTION AGAINST LA SALLE.
 
 
 56
 The appellants object to the trial court's dismissal of their case against LaSalle for wrongful termination of the agency contract. As already noted, the trial court dismissed that action in an order for judgment entered on February 2, 1967. Notice of appeal was filed on April 4, 1967. There were no other motions filed which would extend the thirty days within which appeal must be taken. Failure to file a timely notice of appeal is fatal to the appeal. We, therefore, dismiss the appeal for want of jurisdiction. Barta v. Oglala Sioux Tribe of Pine Ridge Reservation of S.D., 259 F.2d 553 (8th Cir. 1958), cert. denied, 358 U.S. 932, 79 S.Ct. 320, 3 L.Ed.2d 304 (1959).
 
 
 57
 V. THE TRIAL COURT ERRED BY AWARDING UNITED A MONEY JUDGMENT IN THE SUM OF $41,000.
 
 
 58
 Southern argues that the trial court erred in granting United a money judgment as United had failed to request such judgment in its complaint or its proposed order.[8] It also asserts that it has a valid defense to United's claim and that it was not aware of the defense at the time of trial, but could and would have developed it through cross-examination of United's witnesses had it felt that United was requesting a money judgment.
 
 
 59
 No appearance was made by United on appeal.
 
 
 60
 The language used in the complaint and the proposed order was conceivably broad enough to support a money judgment.[9] See Fed.R.Civ.Pro. 8(a)(1). Thus, were we only concerned with its effect, a strong case could be made for affirmance, particularly in view of the fact that United indicated in a colloquy with the court that it was seeking a money judgment against Southern. But see, Poole v. Poole, 287 S.W.2d 372 (Mo.App.1956). We are also faced, however, with Southern's assertion that it has a valid defense to United's claim and the fact that United has not appeared before this Court to dispute this assertion or to support its judgment. Under such circumstances, we are persuaded that the judgment should be vacated and the matter remanded to the District Court for a determination of the validity and extent of United's claim against Southern. This action should not be construed as raising a question as to the validity of the assignments, as to anyone but LaSalle, or as indicating an opinion as to the validity of Southern's defense.
 
 
 61
 We affirm in part and vacate in part the judgment of the District Court in the appeal numbered 18,860 and remand for further action not inconsistent with this opinion. We dismiss for want of jurisdiction the appeal numbered 18,861. Finally, we grant LaSalle's motion requesting that the costs of the supplemental record be taxed against Southern.
 
 
 
 [1]
 Although the cases were considered simultaneously by the same trial court judge, it does not appear that they were formally consolidated
 
 
 [2]
 Officers of Southern were also parties in these actions; however, their rights and liabilities, except as otherwise stated, are identical to Southern's and these parties will not be referred to separately in this opinion
 
 
 [3]
 Officers of LaSalle were also parties and, as indicated in regard to the appellants, supra, n. 2, these parties will not be referred to separately in the opinion
 
 
 [4]
 LaSalle also rquested that a constructive trust be imposed on premiums that might have been transferred to another agency owned by the President of Southern
 
 
 [5]
 Southern had inquired of Ernst & Ernst whether it would perform the audit, Ernst & Ernst informed Southern that LaSalle was its client and it would rather not perform it. On the other hand, it did not specifically refuse. There is no evidence that Southern ever requested of LaSalle whether another firm could have been substituted for Ernst & Ernst
 
 
 [6]
 The special master testified as follows:
 'If the credit was for a transaction which would have been picked up by the agency in the normal accounting practices prior to 8-31, we would not have given credit in our statement.'
 
 
 [7]
 The litigation in this case was paralleled by litigation between LaSalle and Colonial Insurance Agency. The reference to the master included LaSalle's accounts with both agencies. LaSalle was initially required to pay the costs of the special master, but was allowed to recover them from Southern and Colonial as costs. See generally, Heiberg v. Hasler, 1 F.R.D. 735 (N.Y.1944). The court apportioned the total cost of the master between action involving Southern and the action involving Colonial. Colonial is insolvent and LaSalle argues that it should not be made to bear that loss. It argues that the total cost of the master should have been taxed to all the defendants jointly and severally. The fact that LaSalle's claim against Colonial may go unsatisfied is no reason in itself to reverse the trial court's taxation of costs. LaSalle makes no argument why the apportionment between the two actions was an abuse of discretion
 Regardless, it does not appear from the record that LaSalle has cross-appealed from this action; and for the reason stated in Part IV, infra, it cannot argue that the District Court improperly taxed costs in this case. E.g., Standard Acc. Ins. Co. v. Roberts, 132 F.2d 794 (8th Cir. 1942).
 
 
 [8]
 '(Proposed) Order
 'It is hereby ordered, adjudged and decreed that Plaintiff LaSalle Casualty Company and Defendant Southern Agency Company pay to intervenors all proceeds heretofore received by them, or either of them, or hereafter received by them, or eigher of them, in payment of the accounts receivable reflected in Intervenors' Exhibits 1 and 2 until the balance due on the notes of Intervenors from Southern Agency Company, Intervenors' Exhibits 1 and 2, in the amount of $41,622.38, is paid in full.'
 
 
 [9]
 United requested that the future collections be paid over to it by Southern. Such a remedy may require that Southern was in default on the underlying obligation. Cf., Mo.Rev.Stat., 400.9-502 (1965), V.A.M.S
 Regardless, it appeared during the course of the hearing that United was seeking a money judgment:
 'The Court: Do you (attorney for United) desire to put on any testimony about attorneys' fees?
 'Mr. Barken: No, Your Honor, we are not claiming attorneys' fees.
 'The Court: How about interest?
 'Mr. Barken: No, Your Honor, we been figured in on the principal amounts.
 'The Court: You are asking only for the principal of the note?
 'Mr. Barken: That is correct.
 'The Court: Are you asking for a judgment against these persons (the guarantors) individually or just against the company?
 'Mr. Barken: Just against the company, that is the party that executed the notes.
 'The Court: That is Southern Insurance Agency?
 'Mr. Barken: Southern Insurance Agency.
 'The Court: All right. You are not asking for a judgment against these persons individually?
 'Mr. Barken: No, sir. They are not parties to the suit.'