# In the
# United States Court of Appeals
## For the Seventh Circuit
———————

Nos. 04-1748, 04-2324

JESSE ANDERSON and JESTINE TURNBOUGH,

*Plaintiffs-Appellants*,

v.

ROY GRIFFIN, *et al.*,

*Defendants-Appellees*.

———————

Appeals from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 2:98-CV-565-PS—**Philip P. Simon**, *Judge*.

———————

ARGUED NOVEMBER 2, 2004—DECIDED FEBRUARY 7, 2005

———————

Before POSNER, MANION, and EVANS, *Circuit Judges*.

POSNER, *Circuit Judge*.  The jury in this diversity suit for damages arising out of a highway collision returned a verdict for the defendants. The appeal challenges the voir dire, an instruction, the judge's refusal to grant a new trial on the ground that the verdict was against the weight of the evidence, and the computation of court costs. The substantive issues are governed by the common law of Indiana; the others, of course, by federal law.

Roy Griffin was a truck driver employed by Active Transportation Company. One night, as he was driving a semi-tractor truck, manufactured by International Truck

and Engine Corporation, on an interstate highway in Indiana, the driveline suddenly broke (the driveline, or drive shaft, transmits power from the engine to the rear axle), severing the connection between the truck's brake pedal and the brakes and extinguishing the brake lights. Debris kicked up from the surface of the highway struck a pick-up truck driven by Bane Elliott that was traveling behind the semi. Griffin tried to maneuver the semi off the road but was not completely successful and Elliott's pick-up truck crashed into the part that had not cleared the highway. A car driven by plaintiff Anderson (in which her sister, the other plaintiff, was a passenger) was traveling on the highway behind Elliott and ploughed into the wreckage from the collision between the two trucks, injuring the plaintiffs.

Three weeks earlier, Active Transportation Company had taken the semi into Uhl Truck Sales, a dealer in International trucks, because of looseness in the driveline. Joints ("yokes") at various intervals along the driveline act as shock absorbers, and some of these were loose. Uhl's repairman tightened them. He did no work on the slip yoke, which is in the middle of the driveline and is the place at which the driveline broke.

The plaintiffs sued Active Transportation, Griffin, and Elliott, as well as Uhl Truck Sales, but settled during the trial with all but the last. (The defendants continue to be involved in the litigation, however, because of the dispute over court costs discussed at the end of this opinion.) An expert witness testified for the plaintiffs that on the basis of his examination of the semi-tractor truck long after the accident he believed that Uhl had negligently failed to repair the driveline when the truck was brought into its shop before the accident. Uhl's expert riposted that there had been no negligence and speculated that the accident

had been caused by debris on the highway ("road junk") that the semi might have struck or that might have been yanked up and against the driveline by chains hanging down from the truck's chassis (why the loose chains—whether to serve as a ground for a static-electricity buildup in the tractor, for example— is unexplained). The plaintiffs' expert rejoined that because of the speed at which the driveshaft rotates (27 times a second) and the fact that the slip yoke has a housing around it, a piece of road junk would be highly unlikely to strike the yoke with enough force to break the driveline at that point. But the jury sided with Uhl.

The first trial error occurred, according to the plaintiffs, when the judge refused during the voir dire to propound questions to two of the prospective jurors whom the plaintiffs' lawyer suspected of being "skinheads." He feared that skinheads would be prejudiced against the plaintiffs, both of whom are black. The term "skinheads" generally refers to fierce racists, often neo-Nazi in ideology, who shave their heads, e.g., Walter M. Hudson, "Racial Extremism in the Army," 159 *Military L. Rev.* 1, 19-22 (1999), though there is also a group called "Skinheads Against Racial Prejudice," whose specialty is breaking up Ku Klux Klan rallies. *Church of the American Knights of the Ku Klux Klan v. City of Gary*, 334 F.3d 676, 680 (7th Cir. 2003). The jurors in question, who had either shaven heads or very close-cropped hair, were a bearded tool-and-die maker and a young man who had recently spent four years in the army. Both lived in or near towns that had very few black residents. In common with the other prospective jurors the two had been asked about their background, education, and so forth, including what newspapers or magazines they read and what clubs or other organizations they belonged to, and nothing in their answers had suggested that they were skinheads. Nor did

they have any visible tattoos that might have furnished a clue to membership in a racist organization. Nevertheless the plaintiffs' lawyer wanted the judge to ask the two whether they were racists or members of racist organizations. The judge refused. The lawyer then used one of his three peremptory challenges to remove the tool-and-die maker from the jury.

We asked at argument why he hadn't used another of his three peremptory challenges to remove the other suspected skinhead. He answered that he had to use both his remaining peremptory challenges to remove jurors who he believed disliked him. The implication is that it was his own ineptitude in managing to antagonize jurors during the voir dire, rather than the judge's refusing to allow him to pursue the skinhead issue, that resulted in the second suspected skinhead's remaining on the jury. What is more, if the judge had asked the two suspects whether they were racists and they had convinced the judge that they were not, the plaintiffs' lawyer would still have had to try to remove them from the jury, as they would know from the plaintiffs' race where the questions had come from and would probably be offended to have inferences of racism drawn from their personal appearance. And then the lawyer would have been in the same pickle, having three peremptory challenges but needing four—two for the suspected skinheads (exonerated and resentful) and two for the jurors whom he had antagonized on other grounds.

The judge committed no error in refusing to go down the path marked for him by the plaintiffs' lawyer. There was no racial issue in the case. Corporate defendants have no race; and in fact the representative of Active Transportation at the defendants' counsel table during the trial was a black person. Jurors—poorly paid conscripts who play an important role in the American system of justice—have a right not

to be humiliated; questions about their personal appearance, a subject about which most people are sensitive—questions such as "Why is your hair so long?" "Why are you so fat (or so thin)?" "Why are your shirt tails hanging out?" "Are you making a political statement by wearing black lipstick and a ring through your nose?"—should therefore be avoided unless necessary to allay reasonable concerns about a juror's impartiality. See *Tyus v. Urban Search Management*, 102 F.3d 256, 262 (7th Cir. 1996); *United States v. Banks*, 687 F.2d 967, 974-75 (7th Cir. 1982); *United States v. Barnes*, 604 F.2d 121, 140 (2d Cir. 1979); cf. *Press-Enterprise Co. v. Superior Court of California*, 464 U.S. 501, 510-12 (1984).

Many men and even a few women shave their head as a fashion statement (Michael Jordan, the former basketball star, and Richard Grasso, the deposed chairman of the New York Stock Exchange, being conspicuous but not isolated examples); some of course lose all their hair because they are undergoing chemotherapy. Balding young men sometimes decide to go all the way. American soldiers often wear their hair cut so short that their heads look shaven, and that may well be the explanation for the "skinhead" appearance of the juror who had left the army recently. The presence of a shaved head is feeble grounds for suspecting that a person is a skinhead, even if he lives in, let alone merely near, an almost all-white community, as tens of millions of whites do. The questions about reading matter and organizations should have smoked out the presence of any skinheads, if they answered the questions truthfully; if they did not, neither would they answer the question "Are you a skinhead?" truthfully were it put to them by the judge.

Next the plaintiffs complain that the judge should not have instructed the jury that

with respect to the negligence claims of Plaintiffs,

> Defendants owed Plaintiffs only the duty to exercise reasonable care. The mere fact that an accident occurred, or that the Plaintiffs were injured or otherwise sustained damages, does not mean that either the Plaintiffs, or the Defendants, were negligent. Negligence can never be inferred solely, and without more, from the occurrence of an accident and resulting damage.

This is a correct, indeed fundamental, proposition of tort law. That an accident occurs and someone is injured does not establish liability under a negligence standard; the plaintiff has to show that the injury resulted from the defendant's failure to exercise due care. Nevertheless the plaintiffs insist that the instruction is improper under Indiana law. They point out that in *Miller v. Alvey*, 207 N.E.2d 633, 636-37 (Ind. 1965), the Indiana Supreme Court said:

> The expression "unavoidable accident" or "pure accident" is not an affirmative defense and has no particular connotation in modern pleading of negligence cases. Such terminology adds nothing to the issues before the court or jury and as the expressions are ambiguous and particularly confusing to lay jurors, their use in instructions is undesirable and unwise and any statements in prior decisions of this state construed as authorizing instructions on "pure accident" or "unavoidable accident" are hereby disapproved.

See also *White v. Evansville American Legion Home Ass'n*, 210 N.E.2d 845, 846 (Ind. 1965); *Weinand v. Johnson*, 622 N.E.2d 1321, 1323-26 (Ind. App. 1993); *Pierce v. Horvath*, 233 N.E.2d 811, 815-17 (Ind. App. 1968). Similar statements can be found in cases from other states. E.g., *Fry v. Carter*, 825 A.2d 1042, 1050-55 (Md. 2003); *Randle v. Allen*, 862 P.2d 1329, 1334-36 (Utah 1993).

There is to begin with a question whether the propriety of a "mere accident" instruction is a matter of state or federal law. It is the former if it is substantive, the latter if it is procedural, with the line being drawn on the basis of whether the issue is one predominantly of substantive state policy or one predominantly concerning the structure or administration of the court system, *Fidelity & Deposit Co. v. Rotec Industries, Inc.*, 392 F.3d 944, 949 (7th Cir. 2004); *Taco Bell Corp. v. Continental Casualty Co.*, 388 F.3d 1069, 1076 (7th Cir. 2004); *Metfirst Financial Co. v. Price*, 991 F.2d 414, 415-16 (7th Cir. 1993); *Rideau v. Parkem Industrial Services, Inc.*, 917 F.2d 892, 895 (5th Cir. 1990), including the management of the jury. *Byrd v. Blue Ridge Rural Electric Co-op, Inc.*, 356 U.S. 525, 537-39 (1958); *Muzikowski v. Paramount Pictures Corp.*, 322 F.3d 918, 924 (7th Cir. 2003); *AM Int'l, Inc. v. Graphic Management Associates, Inc.*, 44 F.3d 572, 576-77 (7th Cir. 1995); *Allstate Ins. Co. v. James*, 845 F.2d 315, 318 (11th Cir. 1988). Every court system, including the federal, has its own criteria for jury selection, its own procedures for voir dire, its own policy on whether to give preliminary instructions at the outset of a case (which may reduce the need for particular cautionary instructions at the end), its own rules of evidence viewed as screens that limit and shape the evidence presented to the jury, its own conception of the proper division of responsibility between judge and jury, which in civil cases tried by federal courts is governed ultimately by the Seventh Amendment—and, of critical importance in this case, its own methods (some in the above list) for preventing jury confusion. What is confusing to jurors in Indiana state trial courts is not necessarily confusing to jurors in federal district courts; and the judgment is to be made independently by the judges in the different systems. The instruction we quoted is not only unexceptionable as a statement of Indiana law, *McConnell v. Porter Memorial Hospital*, 698 N.E.2d 865, 869

(Ind. App. 1998); *Midwest Commerce Banking Co. v. Livings*, 608 N.E.2d 1010, 1013 (Ind. App. 1993); *Ogden Estate v. Decatur County Hospital*, 509 N.E.2d 901, 902 (Ind. App. 1987); it is simple, lucid, and, in our judgment, unlikely to confuse a federal jury.

Or a state jury—for the Indiana courts themselves would not be troubled by the instruction. They object to terms like "pure accident," "mere accident," and "unavoidable accident," but not to telling the jury that it may not infer negligence from the fact that an accident occurred. *Perry v. Goss*, 255 N.E.2d 923, 926 (Ind. 1970); *Kostidis v. General Cinema Corp.*, 754 N.E.2d 563, 571-74 (Ind. App. 2001); *Weinand v. Johnson, supra*, 622 N.E.2d at 1325; *Anderson v. Baker*, 335 N.E.2d 831, 834 (Ind. App. 1975). The distinction is fine, even tortured—even perhaps backwards. The Indiana courts have condemned reference to "pure," "mere," or "unavoidable" accident in jury instructions lest some jurors think that the word "accident" implies at least some degree of fault and therefore that if an "accident" does not create liability perhaps only deliberate wrongdoing does. The challenged instruction surely dispelled that mistaken impression. But it would have done so even more surely had the judge told the jury that a "mere" or "pure" or "unavoidable" accident does not create liability; for those adjectives serve emphatically to distinguish faultless accidents from those that may involve fault.

Reference to "unavoidable accident" should, we agree, be avoided, but for an unrelated reason: anachronism. *Miller v. Alvey, supra*, 207 N.E.2d at 636. In the early common law, before the negligence standard crystallized, unavoidable accident was an affirmative defense to a tort case. *Weaver v. Ward*, Hobart 134, 80 Eng. Rep. 284 (K.B. 1616), *Randle v. Allen, supra*, 862 P.2d at 1334-35; *Butigan v. Yellow Cab Co.*, 320 P.2d 500, 504 (Cal. 1958); Stephen G. Gilles, "The Inevitable Accident in Classical English Tort Law," 43 *Emory*

*L.J.* 575 (1994). But that is a detail; all that matters here is that the instruction was not confusing.

The plaintiffs further complain that the verdict in Uhl's favor was against the weight of the evidence. They argue that the defendant's expert lacked knowledge of drivelines and experience in diagnosing the causes of accidents involving heavy trucks and that the "road junk" explanation for the accident was implausible. Both points are wide of the mark. The plaintiffs do not argue that the defendant's expert should have been forbidden under the *Daubert* standard to testify because he lacked relevant expertise; and once the expert passes the *Daubert* threshold and is allowed to testify, it is for the jury to weigh his credentials and experience against those of the opposing expert. *Valbert v. Pass*, 866 F.2d 237, 240-41 (7th Cir. 1989); *Wyler Summit Partnership v. Turner Broadcasting System, Inc.*, 235 F.3d 1184, 1192 (9th Cir. 2000); *Streber v. Hunter*, 221 F.3d 701, 726 (5th Cir. 2000); *Ferebee v. Chevron Chemical Co.*, 736 F.2d 1529, 1535 (D.C. Cir. 1984).

As for the conjecture by the defendant's expert that the accident was caused by "road junk," yes, it was implausible; but that is not the test. As we said in *Spitz v. Commissioner*, 954 F.2d 1382, 1384 (7th Cir. 1992) (quoted in *United States v. Beard*, 354 F.3d 691, 692-93 (7th Cir. 2004)), "the plausibility of an explanation depends on the plausibility of the alternative explanations." See also *Bammerlin v. Navistar Int'l Transportation Corp.*, 30 F.3d 898, 902 (7th Cir. 1994); *Sandoval v. Acevedo*, 996 F.2d 145, 150 (7th Cir. 1993); *United States v. Morales*, 902 F.2d 604, 607-08 (7th Cir. 1990); *United States v. Crosby*, 75 F.3d 1343, 1347 (9th Cir. 1996); Ronald J. Allen & Brian Leiter, "Naturalized Epistemology and the Law of Evidence," 87 *Va. L. Rev.* 1491, 1527-29 (2001). Events that have a very low antecedent probability of occurring nevertheless do sometimes occur (the Indian Ocean tsu-

nami, for example); and if in a particular case all the alternatives are ruled out, we can be confident that the case presents one of those instances in which the rare event did occur. If the jury found, as the evidence permitted it to do, that the truck was in good shape when it left Uhl's shop just twenty days before the driveline collapsed, then the likeliest alternative explanations for the accident are either that some deeply hidden defect that Uhl could not have been expected to discover had caused the accident or some external force, such as road debris somehow thrown against the yoke by the motion of the truck; in neither event would Uhl be liable.

Last, the plaintiffs challenge the award of court costs pursuant to Fed. R. Civ. P. 54(d)(1). For obscure reasons, given the "American rule" that requires each side to a lawsuit to bear its legal expenses rather than making the loser reimburse the winner's reasonable expenses, the law allows the winning party to recover from the loser the winner's "court costs," a stereotyped list of usually though not always modest items of expense, exclusive of legal fees. (They amount here to a shade under $13,000.) The rule is generally thought a vestige of the English "loser pays" rule, e.g., John M. Blumers, Note, "A Practice in Search of a Policy: Considerations of Relative Financial Standing in Cost Awards Under Federal Rule of Civil Procedure 54(d)(1)," 75 *B.U.L. Rev.* 1541, 1562-63, 1566 (1995), although insofar as the main objection to the English rule is that calculating a reasonable attorney's fee is difficult and cumbersome, it falls away when the calculation is limited to the items taxable as costs. *Baez v. U.S. Department of Justice*, 684 F.2d 999, 1002-04 (D.C. Cir. 1982) (en banc) (per curiam); see generally *Vincennes Steel Corp. v. Miller*, 94 F.2d 347, 348-49 (5th Cir. 1938); *Trinidad Asphalt Paving Co. v. Robinson*, 52 F. 347 (E.D. Mich. 1892); 10

Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2665, pp. 199-202 (3d ed. 1998). The taxable items, such as making copies of depositions and other documents, and filing and witness fees, are listed in a statute, 28 U.S.C. § 1920; *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 441 (1987); *Cefalu v. Village of Elk Grove*, 211 F.3d 416, 427 (7th Cir. 2000); *Calderon v. Witvoet*, 112 F.3d 275, 276 (7th Cir. 1997) (per curiam); *In re Two Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litigation*, 994 F.2d 956, 962 (1st Cir. 1993), and statutes and court rules specify the amount that may be assessed for each allowed item. E.g., 28 U.S.C. § 1821; *Cengr v. Fusibond Piping Systems, Inc.*, 135 F.3d 445, 455-56 (7th Cir. 1998). So satellite litigation is minimized.

The plaintiffs do not argue that impermissible items were included in the defendants' bill of costs or that the cost awarded per item pierced the ceiling set by rules or statute. They argue instead that the defendants took more depositions than they had to and in this and other ways drove up their court costs unnecessarily. This is a bad argument because, as we have had occasion to note recently, a painstaking judicial inspection of fee claims (and equally cost claims) is unnecessary when there is a market constraint on running up excessive expenses. *Taco Bell v. Continental Casualty Co.*, *supra*, 388 F.3d at 1075. When taking depositions the defendants could have had no confidence that they were going to win the case and thus be able to submit a bill of costs, or that if they won and therefore could submit such a bill the plaintiffs would have the wherewithal to pay it. So they had an incentive not to take unnecessary depositions or otherwise incur excessive costs. That incentive was a better check on extravagance than would be a court's effort to decide after the fact whether a particular expenditure was sensible given its anticipated contribution to a favorable outcome of the litigation.

The judge did not indicate how the costs should be divided between the two plaintiffs. The cases say that the presumptive rule is joint and several liability unless it is clear that one or more of the losing parties is responsible for a disproportionate share of the costs. *White v. Sundstrand Corp.*, 256 F.3d 580, 585-87 (7th Cir. 2001); *Concord Boat Corp. v. Brunswick Corp.*, 309 F.3d 494, 496-97 (8th Cir. 2002); *In re Paoli Railroad Yard PCB Litigation*, 221 F.3d 449, 468-71 (3d Cir. 2000); cf. *Southern Agency Co. v. LaSalle Casualty Co.*, 393 F.2d 907, 915 and n. 7 (8th Cir. 1968). Ordinarily when parties are jointly and severally liable, it means that each party is fully liable, subject to the constraint that the claimant cannot recover more than his total entitlement. This leaves him free to pick and choose and if he wants collect the total entitlement from one of several liable persons—unless there is a rule permitting contribution among joint tortfeasors, or in other words permitting a liable party who has been charged more than his proportionate share (but not because he was causally responsible for more than a proportionate share, in which event it would not really be disproportionate) to obtain compensation from his co-tortfeasors. A brief dictum in *Concord Boat Corp. v. Brunswick Corp.*, *supra*, 309 F.3d at 497, assumes that there is such a rule of contribution in regard to court costs but does not discuss the pros and cons; the other cases that embrace the rule of joint and several liability for costs do not mention contribution at all.

Courts have become reluctant to recognize a right of contribution as a matter either of federal common law or of statute. *Texas Industries, Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630 (1981) (Sherman Act); *Northwest Airlines, Inc. v. Transport Workers Union of America, AFL-CIO*, 451 U.S. 77 (1981) (Title VII and Equal Pay Act); *Bowers v. National Collegiate Athletic Association*, 346 F.3d 402, 429-33 (3d Cir.

2003) (Title II of ADA and Rehabilitation Act); *Herman v. RSR Security Services Ltd.*, 172 F.3d 132, 143-44 (2d Cir. 1999) (Fair Labor Standards Act); *In re Walker*, 51 F.3d 562, 565-68 (5th Cir. 1995) (section 362 of Bankruptcy Code); *Mortgages, Inc. v. United States District Court*, 934 F.2d 209, 212-14 (9th Cir. 1991) (per curiam) (False Claims Act); *Fleming v. Lind-Waldock & Co.*, 922 F.2d 20, 27-28 (1st Cir. 1990) (Commodities Exchange Act); *Getty Petroleum Corp. v. Island Transportation Corp.*, 862 F.2d 10, 16 (2d Cir. 1988) (Lanham Act). The reluctance is understandable. A right of contribution is not required to achieve either the compensatory or the deterrent objectives of the law. The first point is obvious, the second only a little less so. One or more of the defendants may get off scot-free because the plaintiff has collected the entire judgment from another defendant; that is true. But not knowing beforehand whom the plaintiff will go against, each potential defendant has an expectation of being the unlucky one, and that expectation performs the deterrent function. In general, then, all that a right of contribution does is add to the costs of litigation, and so unless there is a compelling reason to suppose that the legislature would want such a right to be enforced, as the Supreme Court found to be the case (unusually) in *Musick, Peeler & Garrett v. Employers Ins. of Wausau*, 508 U.S. 286 (1993) (contribution under the SEC's Rule 10b-5), it will not be.

The bearing of the cases that we have cited and of the considerations that support them was not considered by the court in the *Concord* case. We are given no reason to think that recognizing a right of contribution with regard to court costs would serve any purpose other than to encumber federal litigation, which needs no additional encumbrances. No showing has been made that a particular plaintiff or plaintiffs was disproportionately responsible for the costs

that the judge has awarded against them, and so each plaintiff is jointly and severally liable for the costs that the judge awarded to the defendants.

AFFIRMED.

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*