# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

July 14, 2010

By the Court:

No. 10-2359

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ROD BLAGOJEVICH and ROBERT BLAGOJEVICH,

*Defendants.*

APPEAL OF:

CHICAGO TRIBUNE COMPANY, THE NEW YORK TIMES
COMPANY, ILLINOIS PRESS ASSOCIATION, and
ILLINOIS BROADCASTERS ASSOCIATION

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 08 CR 888—**James B. Zagel**, *Judge.*

## Order

After the court issued its opinion on July 2, 2010, a judge called for a vote on the judge's suggestion of rehearing en banc. This procedure is appropriate under

Fed. R. App. 35(a), because, although Rule 35 authorizes litigants to file petitions for rehearing en banc, it does not condition en banc consideration on the filing of a petition. This court regularly hears cases en banc, without a litigant's petition, under the procedure established by Circuit Rule 40(e). A grant of rehearing en banc on the court's own motion is equally permissible when the panel issues its opinion without a Rule 40(e) circulation.

A majority of the judges in active service have voted not to hear this appeal en banc. Judges Posner, Kanne, Williams, and Sykes voted to hear the appeal en banc.

Circuit Judge Flaum did not participate in the consideration or decision of this case.

POSNER, *Circuit Judge*, with whom KANNE, WILLIAMS, and SYKES, *Circuit Judges*, join, dissenting from denial of rehearing en banc. An experienced trial judge made a reasonable determination that the release of jurors' names before the end of the trial would expose the jurors to the widespread mischief that is a daily if not hourly occurrence on the Internet. The jury is not "anonymous." The jurors' names are known to the parties and will be available to the public at the end of the trial. Given the extremely high profile of this case nationwide as well

as in Illinois, and the unusual attention-getting conduct of the principal defendant and his wife, there is no good argument for releasing the jurors' names before the trial ends.

I'd like to be able to end this opinion right here. But the procedural complexities of the case and the unsound and confusing analysis in the panel's opinions require that I soldier on.

The original panel opinion was issued on July 2 (the amended opinion was issued on July 12). Later that day a member of the court asked for a vote on whether to rehear the case en banc. That is a sufficiently rare procedure to merit a brief comment.

A court is authorized to rehear a case without a request by a party. *Western Pacific R.R. Corp. v. Western Pacific R.R. Co.*, 345 U.S. 247, 262-63 (1953); see also 28 U.S.C. § 46(c); Fed. R. App. P. 35(a) and Committee Notes; *United States v. Shapiro*, 383 F.2d 680, 681 n. 1 (7th Cir. 1967) (en banc); *Radiant Burners, Inc. v. American Gas Ass'n*, 320 F.2d 314, 317 (7th Cir. 1963) (en banc); *United States v. Padilla*, 403 F.3d 780 (1st Cir. 2005) (en banc); *Cooper v. Woodford*, 357 F.3d 1054 (9th Cir. 2004); *Mahony v. CSX Transportation, Inc.*, 980 F.2d 1379 (11th Cir. 1993) (en banc). Although such requests have been rare in this court, several years ago another member of the court did make one, *United States v. Gipson*, 431 F.3d 993 (7th Cir. 2005), and the propriety of doing so cannot be questioned.

After the judges exchanged comments, but before the voting on whether to grant rehearing en banc was com-

plete, the panel decided to alter its opinion to meet some of the concerns expressed in the exchange of comments. This is not an unusual response when rehearing en banc is sought; it is entirely proper. But what is irregular is that the panel issued its amended opinion at the same time that it circulated it, even though several judges eligible to vote on whether to rehear the case en banc had not yet done so—they were awaiting the circulation of the amended opinion. In any event the amendments to the original opinion are perfunctory, confusing, and internally inconsistent.

The case is exceptional and the issue presented by the appeal merits the attention of the full court. The trial of ex-governor Rod Blagojevich and his brother is the most closely followed criminal proceeding in this circuit since the trial of Rod Blagojevich's predecessor as governor of Illinois, George Ryan; and the reversal of Judge Zagel's denial of the media's request for access to the names of the jurors while the trial is still going on has cast a cloud over the trial.

Before jury selection, the district judge promised the pool of prospective jurors that he would not make public the names of the jurors selected for the trial until the trial ended. If as a result of the panel's decision and the hearing that it has ordered, or of a subsequent appeal should the judge reaffirm his ruling after the hearing, he is forced to renege on his promise, the jurors may well be upset, concerned for their privacy, fearful of the prospect of harassment (the prosecutors have already sought a gag order against Rod Blagojevich

because of his out-of-court statements about the case), and angry at having been induced by false pretenses to agree to take months out of their life to perform jury service. (Although jurors are conscripts rather than volunteers, as a practical matter jurors unwilling to sit in cases expected to last months are excused.)

The jurors know by now that a hearing has been ordered to explore whether to continue to maintain the confidentiality of their identities. One of the successful media appellants lost little time in spreading the word. See John Chase, "Identities of Blagojevich Jurors Could Be Made Public," *Chicago Tribune*, July 2, 2010, http://articles. chicagotribune.com/ 2010-07-02/news/ct-met-blagojevich-jurors-20100702_1_juror-names-jurors-names-corruption-trial (visited July 7, 2010). Other media have chimed in. See "Blagojevich Jurors," *Google*, www.google.com/#hl= en&&sa=X&ei=j-c3TKf4M8WBlAepq5nTBw&ved= 0CBsQvwUoAQ&q=blagojevich+jurors&spell=1&fp= 45f7bf772e327ef3 (visited July 9, 2010); see also "Blagojevich Jurors Identities," *Google*, www.google.com/ #hl= en&source=hp&q= blagojevich+ jurors+identities&aq= f&aqi=g-p1&aql=&oq=&gs_rfai=CL9ZBbXg8TNfgFJX 6gAS684TmBwAAAKoEBU_Q9NOn&fp=45f7bf772e327ef3 (visited July 13, 2010). The panel opinions ignore the jurors' likely reactions to the news that the judge must conduct a hearing to determine whether to reveal their names. Conceivably he may decide to declare a mistrial. Should that happen, and the case be retried, what will the new pool of prospective jurors think?

The elaborate preparations that the government would have had to make for presenting the extensive evidence

called for by the original panel opinion would have delayed the end of a trial that even without such an interruption was expected to last between 15 and 17 weeks. (The trial began on June 3, and so may last another 10 to 12 weeks, although there is speculation in the media that it will be over sooner.) Jurors wouldn't like to be told that it would take even longer for them to regain their freedom because of the judge's having to conduct a hearing of uncertain length to determine whether they shall retain their privacy—a matter of great interest to them, though the panel opinions do not suggest that they be consulted about it.

The original panel opinion told the district judge to conduct a hearing that would produce answers to the following "vital questions. *Have* jurors in other publicized cases been pestered electronically (email, instant messaging, or phone calls), or by reporters camped out on their doorsteps? If judges in other high-visibility cases have told the jurors to ignore any unsolicited email or text messages, have those instructions been obeyed? If not, do any practical alternatives to sequestration remain? The Department of Justice, and the lawyers who represent the press, may be able to present evidence and arguments that would be helpful in addressing those issues." (Emphasis in original. As a detail, the word "sequestration" is used in error; it means isolating the jurors from contact with the outside world during the trial.) Evidence about jury experiences or behavior in similar trials would be difficult to obtain, especially since electronic harassment is a relatively new phenome-

non of which little empirical evidence may yet exist. A hearing to address these issues in the depth required by the original opinion could not have been completed quickly.

The amended opinion substitutes for "vital" the words "potentially important," while leaving the list of evidentiary inquiries unchanged. The opinion then inserts a new paragraph, which I must quote in full:

> What evidence the judge must consider depends on what the parties submit. We do not imply that any of the subjects mentioned above is indispensable to a decision. In *Black* the parties chose not to present any evidence, and the court then decided in light of the parties' arguments and the judge's experience with jurors' concerns and behavior. The district judge in this case has referred elliptically to efforts to contact him by email and in other ways; perhaps putting details on the record would help to make concrete some potential effects of disclosing jurors' names while the trial is under way. What is essential—what occurred in *Black* but not so far in this case—is an opportunity for the parties (including the intervenors) to make their views known in detail, followed by a considered decision that includes an explanation why alternatives to delayed release of the jurors' names would be unsatisfactory.

In fact the parties in this case had exactly the same opportunity "to make their views known in detail" and, if they wanted, present evidence as the parties in the *Black* case (discussed later in this opinion); in neither case

did the parties present any evidence of consequence. (Paradoxically, some evidence was presented in this case—none in *Black*.) The handling of the issue by the two district judges was materially identical, and the amended opinion is as a result incoherent. That is the central issue, to which I return later in this opinion. For now the point to note is that the new paragraph of the amended opinion contradicts an unaltered portion of the original opinion in which the panel indicated that an evidentiary hearing is required whenever media seek the names of jurors before the end of a trial because otherwise the district judge would be "act[ing] without evidence," contrary, the panel said, to *Presley v. Georgia*, 130 S. Ct. 721 (2010) (per curiam), and *Waller v. Georgia*, 467 U.S. 39 (1984). That is wrong. *Presley* just requires appropriate findings, and *Waller* protects the defendant's Sixth Amendment right to a public trial, which is not infringed when the media rather than the defendant object to a closed proceeding. Extending the defendant's entitlement to the media, whose right under the First Amendment to information is no greater than the ordinary citizen's, *Pell v. Procunier*, 417 U.S. 817, 833-35 (1974); *Branzburg v. Hayes*, 408 U.S. 665, 684-85 (1972); *Hammer v. Ashcroft*, 570 F.3d 798, 799 (7th Cir. 2009) (en banc), would mean that anytime someone objected to the temporary concealment of the jurors' identities the judge would have to interrupt the trial to hold a hearing.

One way to read the new paragraph of the amended opinion is that there must be an evidentiary hearing, covering the "important" issues flagged in the opinion's preceding paragraph (no other issues relating to whether

to release the jurors' names before verdict are mentioned), unless it is waived. It *was* waived, as we'll see, but in any event trial-type evidence is neither required for, nor likely to be helpful in, the judge's exercise of discretion to withhold jurors' names from the public until the trial ends. Most trial rulings that a judge makes are based on experience and common sense rather than on evidence. Think of the jury voir dire, the phrasing of instructions, the allotment of trial time to the parties, rulings under open-ended standards such as Fed. R. Evid. 403 on objections to the admission of evidence, the trial schedule, and when to direct a mistrial if the jury seems hung. Whether to protect the jurors' identities until the end of the trial is a similar question, calling for an exercise of judgment rather than a taking of evidence.

The panel's initial decision to require a hearing was based on a misreading of *Presley*, a case in which the trial judge had closed the entire jury voir dire to the public on no coherent ground. At one point he suggested that there was no space in the courtroom for the defendant's uncle, at another that he didn't want family members "interming[ling] with members of the jury panel." The Supreme Court reversed but expressly declined to consider what procedures a court must use to determine whether to exclude members of the public. 130 S. Ct. at 725. The misreading of *Presley* remains unchanged in the amended opinion, while the insistence on a hearing, which the panel had inferred from that misreading, has been either eliminated or diluted—I wish I knew which.

Judge Zagel, the district judge in the present case, ruled that the appellants' complaint was untimely. Their opening brief in this court did not challenge that ruling. The judge had told the media on May 17 of his decision to protect the confidentiality of the jurors' identities. Although trial had already been scheduled to begin on June 3, the media did not move to intervene to challenge the judge's decision until June 1. Whether that was too late is arguable; what is unarguable is that the appellants, having failed to challenge the judge's ruling on timeliness, forfeited the challenge. *J.S. Sweet Co. v. Sika Chemical Corp.*, 400 F.3d 1028, 1035 n. 2 (7th Cir. 2005).

The panel opinion (in this as in most respects unamended) says the government waived the appellants' forfeiture at the oral argument. But a waiver is a voluntary relinquishment of a known right, *United States v. Olano*, 507 U.S. 725, 733 (1993); *Estate of Luster v. Allstate Ins. Co.*, 598 F.3d 903, 912 (7th Cir. 2010), and by not complaining about the appellants' failure to challenge the judge's ruling on timeliness the government forfeited rather than waived its complaint. At argument the government's lawyer said "it would appear that the government, by not raising the potential waiver of the timeliness issue by our opponent, *could be seen by the court* as having waived the waiver, so we acknowledge that fact. However, *the court does not need to accept our waiver*, and we don't express an opinion regarding the briefs." It is apparent from the passages that I've italicized that the lawyer was acknowledging forfeiture, not waiver, though as lawyers (and for that matter judges) often do was using "waiver" as a synonym for "forfeiture."

Anyway a court is not bound by a waiver or forfeiture, and not only when the waived or forfeited argument is jurisdictional. *United States v. Schmidt*, 47 F.3d 188 (7th Cir. 1995); *United States v. Contreras-Ramos*, 457 F.3d 1144, 1145 (10th Cir. 2006); see also *United States National Bank v. Independent Ins. Agents of America, Inc.*, 508 U.S. 439, 447 (1993); *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 815-16 (1985); *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 391-92 (7th Cir. 2007); *Massachusetts Bay Ins. Co. v. Vic Koenig Leasing, Inc.*, 136 F.3d 1116, 1122 (7th Cir. 1998); *Amcast Industrial Corp. v. Detrex Corp.*, 2 F.3d 746, 749-50 (7th Cir. 1993); *Aetna Casualty Surety Co. v. P & B Autobody*, 43 F.3d 1546, 1571 (1st Cir. 1994). I don't know *why* the government forfeited the timeliness objection to the appeal. It may have sought a broader victory. But a litigant's tactical decision to go for broke should not tie our hands. This is a case of successive forfeitures, by the appellants and by the appellee. As in *Schmidt* and *Contreras-Ramos*, we should excuse the second forfeiture rather than the first.

Ordinarily the question whether to accept or reject a forfeiture would not warrant consideration by the entire court. But a decision that threatens to derail a very important case, and on unsound grounds, does warrant such consideration. A narrow ruling, enforcing the appellants' forfeiture, would prudently defer resolution of the larger issues to a case in which they were inescapable and in which the court would not be rushed in considering them because a trial clock was ticking.

I have thus far treated the substantive question—whether the district court should be affirmed or reversed—as one

of trial management. But the appellants' entire argument is that they have a constitutional right to the jurors' names before verdict, and they have support for that view in the majority opinion in *United States v. Wecht*, 537 F.3d 222 (3d Cir. 2008). But there was a powerful dissent in *Wecht* which points out (*id*. at 254-55) that other circuits have suggested that limiting the public disclosure of jurors' identities during trial is an acceptable alternative to conducting the voir dire—to which the media has a presumptive right of access under *Press-Enterprise Co. v. Superior Court of California*, 464 U.S. 501 (1984)—in secret. See, e.g., *ABC, Inc. v. Stewart*, 360 F.3d 90, 104-05 (2d Cir. 2004); *United States v. Brown*, 250 F.3d 907, 917 (5th Cir. 2001); *United States v. Wong*, 40 F.3d 1347, 1376-77 (2d Cir. 1994). These cases seem right. (The panel has declined to address the constitutional issue.) Judge Zagel did not conduct the voir dire in secret, as did the trial judge in the *Presley* case, or conceal the jurors' names from the parties and their lawyers.

The majority opinion in *Wecht* oddly emphasizes the role of public disclosure of jurors' identities in preventing "corruption and bias" in a trial, and states that "corruption and bias in a jury should be rooted out before a defendant has to run the gauntlet of trial." 537 F.3d at 239. The emphasis is odd because it falls on a Sixth Amendment argument, grounded in the defendant's interests, and the Sixth Amendment was invoked neither in *Wecht* nor in the present case. And although some psychologists have speculated that jury anonymity increases the probability of conviction, see, e.g., D. Lynn Hazelwood & John C. Brigham, "The Effects of Juror

Anonymity on Jury Verdicts," 22 *Law & Human Behavior* 695, 695-700 (1998), they are talking about cases in which the names of the jurors are never revealed to the public or the parties, which is not our case. Hazelwood and Brigham's study finds a higher rate of conviction only when evidence against the defendant is strong, which suggests that anonymity may actually improve jury decisionmaking by removing impediments to rendering a correct guilty verdict. They find no evidence that anonymous jurors feel less accountable than ones whose names are publicly disclosed. And while some critics of anonymity worry that it impairs jurors' sense of personal responsibility for the outcome and causes jurors to infer that the defendant is guilty, see, e.g., Ephraim Margolin & Gerald F. Uelman, "The Anonymous Jury," *Criminal Justice*, Fall 1994, pp. 14, 16, 61, again these critics are referring to jurors whose names are never revealed. More to the point, the defendants in this case have not objected to Judge Zagel's order; and in the case against Conrad Black (see below) the defendant *wanted* the jurors' identities concealed during the trial.

The interest of the public, as distinct from the interest of the litigants, in learning jurors' identities before the end of a trial is slight in comparison to the jurors' interest in their privacy during a protracted high-profile trial. Jurors are entitled to be treated with respectful regard for their privacy and dignity, rather than as media prey. *Anderson v. Griffin*, 397 F.3d 515, 519 (7th Cir. 2005); *Tyus v. Urban Search Management*, 102 F.3d 256, 262 (7th Cir. 1996); *In re Globe Newspaper Co.*, 920 F.2d 88, 95 (1st Cir. 1990); cf. *Press-Enterprise Co. v. Superior Court of California*, *supra*, 464 U.S.

at 511-12. Most people dread jury duty—partly because of privacy concerns. See Kenneth J. Melilli, "Disclosure of Juror Identities to the Press: Who Will Speak for the Jurors?," 8 *Cardozo Pub. L., Policy & Ethics J.* 1 (2009); David Weinstein, "Protecting a Juror's Right to Privacy: Constitutional Constraints and Policy Options," 70 *Temple L. Rev.* 1, 2-3 (1997); Nancy J. King, "Nameless Justice: The Case for the Routine Use of Anonymous Juries in Criminal Trials," 49 *Vand. L. Rev.* 123, 129 (1996). A degree of anonymity safeguards jurors from intimidation during trial, promotes vigorous debate in the jury room, allows jurors to focus on the facts rather than on how the public might receive their verdict, reduces jurors' anxiety (which may improve jury deliberations), and makes people less reluctant to serve on juries. See, e.g., *id*. at 129; Kenneth B. Nunn, "When Juries Meet the Press: Rethinking the Jury's Representative Function in Highly Publicized Cases," 22 *Hastings Const'l L.Q.* 405, 429-34 (1995); Abraham S. Goldstein, "Jury Secrecy and the Media: The Problem of Postverdict Interviews," 1993 *U. Ill. L. Rev.* 295. These studies focus on full juror anonymity, but their arguments apply, albeit with lesser force, to the issue of partial anonymity involved in this case.

"In a case like this that has garnered intense national and international media attention, releasing juror names during the pendency of trial threatens the integrity of the jurors' ability to absorb the evidence and later to render a verdict based only on that evidence. This is the case because disclosure increases the risk of third-party contact by the press or by non-parties who are monitoring these proceedings through the vast media attention this

case has gathered." *United States v. Black*, 483 F. Supp. 2d 618, 628 (N.D. Ill. 2007); see also *United States v. Vario*, 943 F.2d 236, 240 (2d Cir. 1991); *United States v. Doherty*, 675 F. Supp. 719, 725 n. 7 (D. Mass. 1987); cf. *Sheppard v. Maxwell*, 384 U.S. 333, 342, 353 (1966). "Not all celebrated trials merit an anonymous jury, but '[t]he prospect of publicity militates in favor of jury anonymity to prevent exposure of the jurors to intimidation or harassment.'" *United States v. Branch*, 91 F.3d 699, 724 (5th Cir. 1996), quoting *United States v. Wong, supra*, 40 F.3d at 1377.

The approach that Judge Zagel's colleague Judge St. Eve took in the *Black* opinion from which I have just quoted was sensible, and the panel's amended opinion endorses it—or at least purports to. (The *Black* opinion had been cited in the panel's original opinion, but noncommittally.) Her ruling, protecting the jurors' identities until verdict, was made without an evidentiary hearing. It was based on the high-profile nature, of which she could take judicial notice, of the prosecution of Conrad Black. The prosecution of Rod Blagojevich is higher profile—anyone who doubts that has only to do a Google search under "Blagojevich."

Judge St. Eve's approach is a model of how to deal with the publicity sought by the media in a high-profile case, though she based her ruling not on the kind of evidence that the original panel opinion would have required Judge Zagel to obtain but on her gut sense of what was likely to happen if the jurors' names were released during the trial. She said that "to disclose the jurors' names in a high-profile trial such as this would create

the unnecessary risk that, during the course of the trial, jurors will be subjected to improper and presumptively prejudicial contact." 483 F. Supp. 2d at 630. She noted the "intense" media interest in the case, as well as in the blogosphere. *Id.* at 621. The media and blog interest in the Blagojevich trial is greater than it was in the Black trial. Rod Blagojevich is a better known and more colorful figure than Conrad Black, and online reporting has expanded rapidly in the last three years. "The Official Guide to Blagojevich Blogs," http://legalinsurrection. blogspot.com/2008/12/official-guide-to-blagojevich-blogs.html (visited July 13, 2010), lists six "Pure Blago Blogs," two "Blago Blog Aggregators," twelve "Illinois Blogs" that have extensive coverage of Blagojevich's travails, and twenty-three other blogs that provide occasional coverage of Blagojevich. The blogs do not discuss only Blagojevich's criminal trial, but that is the focus of their current postings.

Judge St. Eve predicted that releasing juror names during the trial of Conrad Black would impair the jurors' ability to render a verdict based only on the evidence, because it would "increase[] the risk of third-party contact by the press or by non-parties." 483 F. Supp. 2d at 628. Likewise Judge Zagel said in denying the media's motion in the present case that it is a unique case involving "enormous public attention, an enormous expression of views." He observed that there had already been "extraordinary attention paid to this case." He had received unsolicited emails and letters regarding the trial. He noted the risk that people might attempt to influence the jurors at their homes. And, he added, "these are all problems

that we've dealt with before." He considered an alternative to concealing the jurors' identities—instructing the jurors not to read emails—but rejected it because it would "impose burdens on jurors that are unfair."

In distinguishing between Judge St. Eve's handling of the juror privacy issue in Black's case and Judge Zagel's handling of the same issue in the Blagojevich case, the panel is splitting hairs. Judge St. Eve invited the lawyers to submit briefs, and they did, but they briefed the *legal* issue—the standard for determining whether to conceal the jurors' identity until the end of the trial—and it is the focus of her opinion. The opinion does not refer to submissions by the parties, let alone to factual submissions. There were none, except some excerpts from media coverage of the case and a letter to Judge Pallmeyer, the judge presiding at the criminal trial of Blogojevich's predecessor as governor, George Ryan, introduced to rebut Black's claim that the press had been instructed in Ryan's case not to reveal the jurors' names. The only facts referred to in Judge St. Eve's opinion concern the publicity attending the prosecution, which were matters of public record and common knowledge rather than of "evidence," and her receipt of expressions of concern from members of the venire about publicity. (The amended panel opinion suggests that Judge Zagel, if he wants to refer to communications with him, must put them on the record. Judge St. Eve had not done so.) Judge Zagel actually had a bit of trial-type evidence before him (Judge St. Eve did not)—an affidavit from a *Chicago Tribune* reporter listing the high-profile trials in the Northern District of Illinois in which jurors' names

had been made public at the outset of the trial. So the media *have* submitted evidence, that evidence was before Judge Zagel when he ruled, and the media do not argue that they were prevented from submitting more evidence. Doubtless they submitted no additional evidence because they believe—it is the only ground of their appeal—that the First Amendment entitles them to the jurors' names unless threats are made against the jurors.

The sources that Judge St. Eve cited in support of her concern that the media and the blogs might invade the jurors' privacy and by doing so disrupt the trial were all published materials rather than trial-type evidence. And from similar sources we know and Judge Zagel knows that there is much more publicity attending the Blagojevich prosecution and therefore greater danger if the jurors' names are revealed before the trial ends. After *Black* the prosecution of Blagojevich presented an *a fortiori* case for protecting the juries' identities until verdict and so Judge Zagel could just have said "I agree with Judge St. Eve. Jurors' names should be withheld in a high-profile case. This case has an even higher profile than Black's." (He did say he agreed with her handling of the *Black* case; the appellants in the present case take strenuous issue with *Black*.) If there is a right to public knowledge of jurors' identities before the end of trial, all concede that it is a qualified right; and in light of the Supreme Court's reservation in *Presley*, its procedural contours are unsettled. All *Presley* requires is that the trial judge identify "the particular interest, and the threat to that interest," that justify concealing material information from the public. 130 S. Ct. at 725. That requirement

was satisfied in this case, as it had been in *Black*—in both cases with notable informality so far as compiling evidence was concerned, and without a hearing.

The only difference is that Judge Zagel decided to protect the jurors' privacy *before* he heard from the media. If that was an error, it was harmless, as this case is an even stronger one than *Black* for juror privacy. But it was not an error, because it was a tentative ruling and the media had an opportunity to ask the judge to reconsider it, and they took the opportunity. That places Judge Zagel's decision on a more solid foundation than Judge St. Eve's because the present case has a much higher public profile than the prosecution of Conrad Black, a Canadian businessman.

If there was an error by Judge Zagel (there was not), not only was it harmless; it was forfeited, because the appellants have not asked for a hearing. Their motion to intervene did not ask for one, nor their briefs in this court. In the district court they asked for the jurors' names and in this court they ask that Judge Zagel be ordered to give them the names. Having waited to move to intervene until two days before the trial was scheduled to begin, they had to realize that it was too late for an evidentiary hearing. Knowing from the precedent of the Black trial that the jurors' names might be withheld from the public until the verdict was rendered, and warned by remarks made by Judge Zagel himself back in June of last year that he might do the same in this case, the media would have had their motion to intervene ready to file in time for the holding of a pretrial hearing had they

wanted a hearing. They didn't want one, as further shown by the statement in their opening brief in this court that "there is no justification that *could* have been made for empanelling an anonymous jury in this case" (emphasis added). They argue that only threats against jurors can justify concealing their names. Their decision not to ask for a hearing is the second forfeiture we should enforce.

So, to quote from the new paragraph of the amended opinion, there *was* "an opportunity for the parties (including the intervenors) to make their views known in detail, followed by a considered decision that includes an explanation why alternatives to delayed release of the jurors' names would be unsatisfactory."

The informality of Judge St. Eve's proceeding in the *Black* case was doubtless related in her mind to her having ruled that there is no presumptive right of public access to jurors' names during the trial. 483 F. Supp. 2d at 625. That put the burden of producing facts on the media, and they produced none. She noted that the secrecy of jury deliberations is sacrosanct, and that it is anomalous to turn jurors into public figures. *Id.*; cf. *United States v. Doherty*, *supra*, 675 F. Supp. at 725 n. 7; *Gannett Co. v. State*, 571 A.2d 735, 750-51 (Del. 1989). Indeed much that goes on in a criminal trial as in a civil trial is closed to the public. The English courts, in contrast, have, until quite recently when rising caseloads forced the courts to change their practice, followed a strict rule of "orality." Everything that judges did had to be done in public—so no judicial deliberations in appeals, for example, or even

judges' reading pleadings and briefs other than during trial or appeal (and no law clerks or secretaries). Robert J. Martineau, *Appellate Justice in England and the United States: A Comparative Analysis* 101-03 (1990). That is not our tradition.

The panel opinion overrules Judge St. Eve's sensible ruling rejecting any presumption in favor of disclosure of jurors' names before verdict. It does so on the basis not of the First Amendment but of a purported "common-law right of access by the public to information that affects the resolution of federal suits," a right said to be based on the "common-law tradition of open litigation," and of the Jury Selection and Service Act, 28 U.S.C. §§ 1861 *et seq.* These parts of the opinion are unaltered by the amendment. They are unsound.

Whatever the situation in England, there is no *general* federal common-law right of public access to information relating to federal litigation. Such a right would create a presumption of access to jury deliberations, appellate judicial deliberations, depositions whether or not used at trial, terms of settlement, grand jury proceedings, judges' discussions with their law clerks, and so on. No one thinks that the media can demand access to any of these phases of the litigation process, or that if they do the judge must hold a hearing to consider their demand; why should the media have a presumptive right to the names of the jurors before a trial ends?

The panel cites *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 602 (1978), which created a "presumption . . . in favor of public access to judicial records" to enable the public to "monitor the functioning of our courts, thereby

insuring quality, honesty and respect for our legal system." *In re Continental Illinois Securities Litigation*, 732 F.2d 1302, 1308 (7th Cir. 1984). But jurors' *names*—as distinct from evidence, *United States v. Criden*, 648 F.2d 814, 822 (3d Cir. 1981), materials attached to dispositive motions, *Republic of Philippines v. Westinghouse Electric Corp.*, 949 F.2d 653, 660 (3d Cir. 1991), and judicial rulings—are not judicial records. "The courts have not extended [the common-law right of access] beyond materials on which a court relies in determining the litigants' substantive rights." *Anderson v. Cryovac, Inc.*, 805 F.2d 1, 13 (1st Cir. 1986); see also *United States v. Amodeo*, 44 F.3d 141, 145-46 (2d Cir. 1995). (And thus, for example, the right of access does not extend to discovery materials. *Anderson v. Cryovac, Inc.*, *supra*, 805 F.2d at 13.) "[J]uror names and addresses are collateral information kept by the court for its necessary administrative purposes, rather than being court proceedings or records of such proceedings." *In re Globe Newspaper Co.*, *supra*, 920 F.2d at 94; contra, *In re Baltimore Sun Co.*, 841 F.2d 74, 75 (4th Cir. 1988). Anyway the jurors' names are to be protected only until verdict.

If there is a federal common-law right of access to information other than "materials on which a court relies in determining the litigants' substantive rights," *Anderson v. Cryovac, Inc.*, *supra*, 805 F.2d at 13, then, being a common-law right rather than a constitutional right, it can be supplanted by legislation. E.g., *United States v. Gonzales*, 150 F.3d 1246, 1262-63 (10th Cir. 1998). And it has been. The panel has turned the Jury Selection and Service Act on its head. The Act requires each district court to adopt a plan for jury selection, and section

1863(b)(7) provides that the plan must "fix the time when the names drawn from the qualified jury wheel shall be disclosed to parties and to the public." The implication is that the plan can withhold disclosure of jurors' names until the trial ends, or later for that matter. That is what Judge St. Eve concluded in the opinion that the panel otherwise admires. 483 F. Supp. 2d at 626. The conclusion is supported by the Act's legislative history. The Act "permits the present diversity of practice to continue. Some district courts keep juror names confidential for fear of jury tampering. Other district courts routinely publicize the names." See H.R. Rep. 1076, 90th Cong., 2d Sess. 11 (1968). The Act was passed in 1968, and the passage I just quoted from the House Report shows there was no common-law right of access to jurors' names then; nor could one evolve after the Act was in place, occupying the field.

The jury selection and service plan for the U.S. District Court for the Northern District of Illinois, which the appeal does not challenge, provides that "any judge of this Court may order that the names of jurors involved in a trial presided over by that judge remain confidential if the interests of justice so require." That is what Judge Zagel found. The plan creates no presumption of public access and does not require the judge to hold a hearing to make this determination. "[T]he decision as to access is one best left to the sound discretion of the trial court." *Nixon v. Warner Communications, Inc.*, *supra*, 435 U.S. at 599. There was no abuse of discretion by Judge Zagel, just as there was none by Judge St. Eve in the hearing-less *Black* case.

The original panel opinion had held explicitly that federal common law and the jury selection and service statute create a presumptive right of public access to jurors' names before verdict. Nothing in that part of the opinion was changed. Yet the amended opinion casts doubt on whether the panel adheres to its original holding, for the other new paragraph of the amended opinion begins: "Instead of constructing a framework for hearings, findings, and *rules of decision*, we think it best to wait until a hearing has been held" (emphasis added). The original opinion, in a part that survived into the amended one, establishes a rule of decision: a presumption of access based on federal common law and the jury statute. Notice also how in this passage the requirement of an "opportunity" for a hearing in the preceding new paragraph of the amended opinion molts into a requirement for a hearing.

One last point: the panel has ducked the constitutional issue because it thinks it has alternative, nonconstitutional grounds for a presumption that the media are entitled to the names of jurors in advance of verdict. If those grounds fail, as I think they do, *a fortiori* there has been no showing of a violation of the media's constitutional rights.

We should vacate the panel opinions and affirm the district court.